[No. D042481. Fourth Dist., Div. One. Jan. 28, 2005.]

SYLVIA OFFNER CAIRA, Plaintiff and Respondent, v.
LAURENS OFFNER, Defendant and Appellant.
LAURENS OFFNER, Cross-complainant, Cross-defendant and Appellant, v.
ALEXANDRA PONCE DE LEON, Individually and as Independent
Administrator, etc., et al., Cross-defendants, Cross-complainants and
Respondents;
ROBIN OFFNER, Cross-defendant and Respondent.
ALEXANDRA PONCE DE LEON, Individually and as Executor, etc., et al.,
Plaintiffs and Respondents, v.
LAURENS OFFNER, Defendant and Appellant.

## COUNSEL

English & Gloven, Donald A. English, Mark M. Gloven, William J. Garrison; Law Offices of Mary A. Lehman and Mary A. Lehman for Defendant and Appellant and for Cross-complainant, Cross-defendant and Appellant.

Vantage Law Group, Michael H. Riney; and Richard H. Benes for Plaintiff and Respondent Sylvia Offner Caira.

Vantage Law Group, Michael H. Riney; and Richard H. Benes for Cross-defendants, Cross-complainants and Respondents and for Plaintiffs and Respondents Alexander Ponce De Leon et al.

Vantage Law Group and Michael H. Riney; and Richard H. Benes for Cross-defendant and Respondent.

OPINION

AARON, J.—

I.

INTRODUCTION

Laurens Offner (Laurens) appeals a judgment entered against him in three consolidated actions involving disputes between him and his three siblings, Robin Offner (Robin), Alexandra Offner Ponce De Leon (Alexandra), and Sylvia Offner Caira (Sylvia) (collectively Siblings), and the estate of his father, Dr. Franklin F. Offner (the Estate).[1] The actions involved disputes over the ownership of a family company, Platypus Wear, Inc., and its subsidiary, P.W. Industries (Platypus),[2] and Laurens's alleged conversion of Platypus's corporate assets for his personal use.

The trial court impaneled a jury in the consolidated actions. The jury rendered a special verdict finding that: (1) Laurens owned certain shares of Platypus's common stock in dispute; (2) Sylvia owned 5,500 shares of Platypus's preferred stock; and (3) Laurens had converted $588,535 worth of Platypus's corporate assets for his personal use. The jury also found that Laurens had acted with malice, fraud, or oppression, and awarded punitive damages in the amount of $150,000.

The trial court determined that all of the actions were equitable claims and that the jury's verdict was therefore merely advisory. The trial court entered a judgment consistent with the jury's special verdict, with one exception. Contrary to the jury's verdict, the trial court found that the shares of Platypus's common stock in dispute were owned by the Estate, not by Laurens.

On appeal, Laurens contends the trial court erred in: (1) denying him the right to a jury trial on the issue of the ownership of Platypus's common stock; (2) excluding from evidence, pursuant to Evidence Code section 1152, an e-mail sent by Robin to Sylvia, Alexandra and Laurens during settlement negotiations, in which Robin mentioned the possibility of repurchasing the 5,500 shares of Platypus's preferred stock from a third party; and (3) entering an award of $150,000 in punitive damages when the jury did not have sufficient evidence of Laurens's financial condition. We affirm the judgment.

---

[1] We use first names for purposes of clarity and intend no disrespect.

[2] The distinction between these two entities is not relevant for purposes of this appeal. Therefore, for ease of reference, we refer to them interchangeably as "Platypus."

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

 1. *The founding of Platypus*

In the early 1980's, Laurens and a friend, Scott Cermansky, founded Platypus as a beachwear clothing company. In 1984, Laurens and Cermansky incorporated Platypus. Initially, Laurens owned 62.5 percent of Platypus and Cermansky owned 37.5 percent. About a year later, the Siblings purchased Cermansky's share of Platypus, with Robin, Alexandra, and Sylvia each owning 12.5 percent of the company.

 2. *The 1986 Agreement*

In 1986, Laurens entered into an agreement (1986 Agreement) with his father, Dr. Franklin Offner (Dr. Offner), which provided in relevant part:

"I, the undersigned Laurens Offner, as security for:

"(1) Loans made and/or to be made to him personally for the benefit of Platypus . . . by Franklin Offner;

"(2) Loans made to Platypus . . . directly by Franklin Offner; and

"(3) Loans made by others to Platypus . . . , and guaranteed by Franklin Offner,

"do hereby transfer to Franklin Offner 49% of the stock I presently hold in Platypus . . . .

"Unless said 49% of the stock is disposed of earlier by Franklin Offner as a part of the restructuring or sale of the company, he agrees to return to Laurens Offner said stock when said loans, with accrued interest, have been repaid to Franklin Offner, and he has been released by lender or lenders from all guarantees under (3) above."

 3. *The 1989 Agreement*

In 1989, Laurens determined that it was necessary to reorganize Platypus. As part of the reorganization plan, Platypus entered into an agreement (the

1989 Agreement) in which Dr. Offner agreed to receive 29,000 shares of preferred stock in Platypus in exchange for $2,900,000 Platypus owed Dr. Offner.

### 4. *The post-1989 period*

In mid-1994, Dr. Offner was diagnosed with Alzheimer's disease. In December 1994, Dr. Offner executed various family planning documents. He created a trust (the Trust) and executed a power of attorney in favor of his wife, Janine Offner (Janine). In July 1996, Dr. Offner's doctor determined that Dr. Offner was no longer competent to manage his own affairs.

By 1997, the Siblings began to actively participate as shareholders of Platypus. In October 1997, a dispute arose with regard to 5,500 shares of preferred stock. Laurens claimed he owned the shares because Dr. Offner had transferred the shares to him in September 1995. The Siblings claimed that Dr. Offner was not competent to make such a transfer at that time. The Platypus board of directors resolved the issue by reissuing the 5,500 shares to the Trust. In December 1997, the Trust sold 5,500 of the 29,000 shares of Dr. Offner's preferred stock to Paula Sandberg, a friend of Alexandra.

Dr. Offner died in May 1999, and Janine died in November 2000. Alexandra was named executor of the Estate. The Siblings learned the extent of Dr. Offner's investment in Platypus only after their parents' deaths. The Siblings also became concerned that Laurens may have been converting Platypus's corporate assets for his personal use. From June through October 2001, the Siblings and Laurens exchanged numerous e-mails in an attempt to resolve various disputes regarding Platypus. In April 2002, Sandberg transferred the 5,500 shares of preferred shares to Sylvia.

## B. *Procedural summary*

### 1. *The three actions*

This appeal stems from three consolidated actions: *Buckley v. Platypus Wear, Inc.* (Super. Ct. San Diego County, 2003, No. GIC 785142) (the Buckley Action), *Platypus Wear, Inc. v. Offner* (Super. Ct. San Diego County, 2003, No. GIC 790273) (the Platypus Action), and *Ponce De Leon v. Platypus Wear, Inc.* (Super. Ct. San Diego County, 2003, No. GIC 797739 (the Corporations Code Action).

#### a. *The Buckley action*

In the Buckley Action, Robert Buckley, acting as trustee of the Trust, brought a breach of contract claim and an action to recover collateral against

Laurens and Platypus, in an attempt to collect on a 1994 note. The trial court granted summary judgment on those claims and they are not at issue in this appeal. In addition, Sylvia brought shareholder derivative claims and claims for an accounting, and a constructive trust against Laurens on behalf of Platypus, based on allegations that Laurens had converted Platypus's corporate funds for his personal use.

### b. *The Platypus action*

The Platypus Action involved three complaints. Platypus filed a declaratory relief action in which it claimed that there was a dispute between the Siblings and Laurens regarding the ownership of 30,625 shares of its common stock and 5,500 shares of its preferred stock. Platypus sought a judicial determination of the ownership of the stock in dispute.

Alexandra and Sylvia filed a cross-complaint. The cross-complaint was styled as a request for declaratory relief, seeking a judicial determination of the ownership of the common and preferred stock referred to in Platypus's complaint. With regard to the common stock, Alexandra and Sylvia alleged that the 1986 Agreement transferred the common stock to Dr. Offner, that the transfer had not been reversed, and that the shares thus remained the property of the Estate. Alexandra and Sylvia alleged that Laurens claimed the 1986 Agreement had never been formalized, and that any obligation to transfer stock had been discharged by the restructuring of Platypus in 1989, when Dr. Offner was given preferred shares.

With regard to the 5,500 shares of preferred stock, Alexandra and Sylvia alleged that in 1997, the Trust sold 5,500 preferred shares to Sandberg and that in 2002, Sandberg sold the shares to Sylvia. Alexandra and Sylvia alleged that Laurens claimed the 5,500 shares had been previously transferred by Dr. Offner to Platypus and that therefore the shares had not been available for transfer to Sandberg.

Laurens brought a cross-complaint in which he alleged that the Estate had breached the 1986 Agreement by "claiming ownership to certain of Laurens' Platypus common stock." He requested monetary damages for this breach. Laurens also brought similar claims and requests for damages with respect to the 1989 Agreement and the 5,500 shares of preferred stock.

Laurens further alleged in his cross-complaint that there was a dispute between the Estate and Laurens regarding whether the 1986 Agreement entitled Dr. Offner to ownership of any of Platypus's common stock and, if so, whether any such entitlement had been extinguished by the 1989 Agreement. In addition, Laurens claimed that either he or Platypus, and not Sylvia,

owned the disputed shares of the preferred stock. Laurens requested declaratory relief as to the ownership of the disputed shares of common and preferred stock.

### c. *The Corporations Code action*

The Siblings, including Alexandra both in her individual capacity and as the executor of the Estate, brought an action pursuant to Corporations Code section 709 seeking an order directing Platypus to register 30,625 shares of common stock in the name of the Estate and 5,500 shares of preferred stock in Sylvia's name. The complaint also sought to resolve various other corporate governance issues involving Platypus that are not relevant to this appeal.

### 2. *Evidentiary rulings*

Prior to trial, the trial court granted motions in limine brought by both Laurens and the Siblings to exclude from evidence, under Evidence Code section 1152, various e-mails sent among Laurens and the Siblings during settlement negotiations. Laurens subsequently filed a motion to vacate the trial court's ruling on the Siblings' motion, claiming that Evidence Code section 1152 did not preclude admission of an e-mail Robin sent to Sylvia, Alexandra and Laurens on October 1, 2001. The record does not indicate whether or not the trial court ruled on this motion.

### 3. *The jury's special verdict*

The jury rendered a special verdict, finding that Laurens owned the disputed shares of Platypus's common stock, and that Sylvia owned the disputed 5,500 shares of Platypus's preferred stock. The jury also found that Laurens had converted $588,535 worth of Platypus's corporate assets for his personal use. In addition, the jury found that Laurens had acted with malice, fraud, or oppression, and awarded punitive damages in the amount of $150,000.

### 4. *The court's consideration of the jury's special verdict*

After dismissing the jury, the court stated: "We are in session now to work on those matters that were reserved to the court. And I know [Laurens's counsel] has previously expressed the view that the only issues for the jury were the common stock, that would be the issues concerning Exhibit 28.[3] And the jury has provided a verdict on that and the preferred stock . . . and the jury has provided us with its decision on those issues, and that all the

---

[3] Exhibit 28 was the 1986 Agreement referring to the shares of common stock in dispute.

remaining issues are for the Court, And the Court sought some advisory verdicts from the jury in that regard, and we have a number of those. So I'd like to hear from each counsel regarding those decisions in each counsel's view which remain for the court to decide."

The Siblings' counsel argued that the court was to decide the issue of the ownership of the common stock. Laurens's counsel maintained that this issue was properly one for the jury. The next day the court heard further argument regarding the ownership of the common stock and whether the issue of ownership was for the court, or the jury, to decide. The court stated, "I asked for advisory verdicts on a number of items. And this was one of the questions I asked by way of an advisory verdict."[4]

### 5. The trial court's judgment

The court found that Sylvia owned the 5,500 shares of preferred stock. However, contrary to the jury's advisory verdict, the court found that the Estate owned the 30,625 shares of common stock. The court agreed with the jury's advisory verdict regarding Sylvia's shareholder derivative claims and the imposition of compensatory and punitive damages as to those claims. Specifically, the court found Laurens had abused his position of trust and confidence with Platypus in converting a total of $588,535 worth of corporate funds for his personal benefit. The court awarded compensatory damages in this amount and also awarded prejudgment interest in the amount of $47,540. The court further found that Laurens had acted with fraud, oppression, and malice in converting Platypus's funds for his personal benefit, and awarded an additional $150,000 in punitive damages against him on Sylvia's derivative complaint.[5]

### 6. Laurens's motion for a new trial and appeal

Laurens filed a motion for a new trial. The trial court denied the motion in its entirety. Laurens timely appeals.

---

[4] "There can be no question that there may be an advisory jury in an equitable action, and that a trial court has the discretion to submit issues to a jury and adopt the jury's findings on factual matters." (Saks v. Charity Mission Baptist Church (2001) 90 Cal.App.4th 1116, 1147 [110 Cal.Rptr.2d 45].)

[5] The court also found that the Estate owned an additional 23,500 shares of Platypus preferred stock. Further, the court imposed a constructive trust in favor of Platypus over various assets of Laurens, and resolved a number of issues pertaining to corporate governance of Platypus. The court enjoined Laurens from serving on the board of Platypus until he paid the judgment in this action, or June 26, 1997, whichever occurred later. In addition, the court ordered that Laurens take nothing on his cross-claims. Laurens raises no claims with respect to these portions of the judgment.

## III.

## DISCUSSION

A. *Laurens did not have the right to a jury trial under the California Constitution on the issue of the ownership of Platypus's common stock*

Laurens claims he had the right, under the California Constitution, to a jury trial on the issue of the ownership of Platypus's common stock.

### 1. *Standard of review*

The issue whether Laurens was constitutionally entitled to a jury trial on the issue of the ownership of the common stock is a pure question of law that we review de novo. (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960] [noting that questions of law not involving disputed facts are reviewed de novo].)[6]

### 2. *The right to a jury trial under the California Constitution*

Article 1, section 16 of the California Constitution provides in relevant part: "Trial by jury is an inviolate right and shall be secured to all . . . ."

■ In *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 8 [151 Cal.Rptr. 323, 587 P.2d 1136] (*C & K Engineering Contractors*), the California Supreme Court outlined the basic parameters governing the right to a jury trial under the state Constitution: "The right to a jury trial is guaranteed by our Constitution. (Cal. Const., art. I, § 16.) We have long acknowledged that the right so guaranteed, however, is the right as it existed at common law in 1850, when the Constitution was first adopted, 'and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact.' [Citations.] As a general proposition, '[The] jury trial is a matter of right in a civil action at law, but not in equity.' "

■ The *C & K Engineering Contractors* court also outlined the manner by which a court should determine whether an action is one at law or in equity: " ' "If the action has to deal with ordinary common-law rights cognizable in courts of law, it is to that extent an action at law. In determining whether the action was one triable by a jury at common law, the

---

[6] The parties have not cited, and our research has not uncovered, any authority that directly considers the issue of the proper standard of review to employ in considering a claim to the right to a jury trial under the California Constitution. However, the question is clearly one of law. The Siblings do not dispute that the de novo standard of review applies.

court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law." ' [Citation.] On the other hand, if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial." (*C & K Engineering Contractors, supra,* 23 Cal.3d at p. 9.)

The *C & K Engineering Contractors* court also explained that while the relief sought is among the most important factors in determining whether an action is legal or equitable, it is not necessarily determinative: "Although we have said that 'the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded' [citation], the prayer for relief in a particular case is not conclusive [citations]. Thus, 'The fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury . . . .' " (*C & K Engineering Contractors, supra,* 23 Cal.3d at p. 9.)

### 3. *Declaratory relief and quiet title claims are generally equitable*

It is well established that a true action for declaratory relief is equitable: "An action for declaratory relief is an equitable proceeding and the powers of a court are as broad and extensive as those exercised by such court in any ordinary proceeding in equity [citation]. It is elementary that questions relating to the formation of a contract, its validity, its construction and effect, excuses for nonperformance, and termination are proper subjects for declaratory relief [citation]." (*Fowler v. Ross* (1983) 142 Cal.App.3d 472, 478 [191 Cal.Rptr. 183] (*Fowler*).)

Declaratory relief is "classified as equitable by reason of the type of relief offered." (5 Witkin, Cal. Procedure (4th ed. 1996) Pleading, § 806, p. 262.) More specifically, a declaratory action to identify rights is distinct from a coercive action to enforce rights. (*State Farm Mut. Auto. Ins. Co. v. Superior Court* (1956) 47 Cal.2d 428, 430 [304 P.2d 13] (*State Farm*).) At common law, only the latter existed. (*Tolle v. Struve* (1932) 124 Cal.App. 263, 271 [12 P.2d 61].) Thus, declaratory relief developed as an equitable form of relief to fill this gap. (*Ibid.*)

An action to quiet title is akin to an action for declaratory relief in that the plaintiff seeks a judgment declaring his rights in relation to a piece of property. (Code Civ. Proc., § 764.010 ["The court shall examine into and determine the plaintiff's title against the claims of all the defendants"]; 5 Witkin, Cal. Procedure, *supra,* Pleading, § 811, p. 266 [noting that an action

to quiet title has a "declaratory effect"].)[7] As with declaratory relief in general, the action to quiet title evolved as an equitable remedy: "The action to quiet title, under our practice, is a development of the bill of peace of the court of chancery. The main purpose of this proceeding was to prevent repeated attempts to litigate a title, and to protect the real owner of the right against the annoyance and expense incidental to a multiplicity of suits. It was upon these considerations that the court of chancery 'has granted perpetual injunctions to restrain further litigation, and thus has in some degree put that restraint upon litigation which was the policy of the ancient law in real actions.' (1 Pomeroy's Equity Jurisprudence, 3d ed., § 248.)" (*Brewer v. King* (1956) 139 Cal.App.2d 33, 41 [293 P.2d 126].)

Thus, it is also well established that actions to quiet title, like true declaratory relief actions, are generally equitable in nature. (*Strauss v. Summerhays* (1984) 157 Cal.App.3d 806, 812 [204 Cal.Rptr. 227] (*Strauss*).)

Notwithstanding the foregoing, a party cannot, merely by labeling his action "declaratory," circumvent the other party's right to a jury trial where a "coercive" claim sounding in law is involved. In *State Farm, supra,* 47 Cal.2d at page 430, an insurance company commenced an action styled as a request for declaratory relief against its insured to determine whether its policy provided benefits in connection with an automobile accident involving the insured. While the declaratory relief action was pending, several personal injury suits were brought against the insured. (*Ibid.*) The Supreme Court held that the trial court had properly granted a jury trial in the declaratory relief action: " '[I]f the issues of fact arising would have been triable by a jury as of right in an action which might have been substituted for the declaratory judgment action by either party, then there is a right to jury trial on such issues.' While *Kaliterna v. Wright* [1949] 94 Cal.App.2d 926 [212 P.2d 32], appears to hold that, regardless of the circumstances, the court in a declaratory relief action may dispose of all factual issues without a jury, such view fails to preserve the distinction between legal and equitable issues, and it must be disapproved. [Citation.] In short, the 'courts will not permit the declaratory action to be used as a device to circumvent the right to a jury trial in cases where such right would be guaranteed if the proceeding were coercive rather than declaratory in nature.' " (*State Farm, supra,* 47 Cal.2d at pp. 431–432.)

In particular, "Where an action for declaratory relief is in effect used as a substitute for an action at law for *breach of contract*, a party is entitled to

---

[7] An action to quiet title may be used to establish ownership of personal property as well as real property. (Code Civ. Proc., § 760.020, subd. (a); see, e.g., *Hardison v. Corbett* (1942) 55 Cal.App.2d 310 [130 P.2d 226] [quiet title action to settle dispute over ownership of corporate stock].)

a jury trial as a matter of right." (*Patterson v. Insurance Co. of North America* (1970) 6 Cal.App.3d 310, 315 [85 Cal.Rptr. 665], italics added.) That is because "a suit to recover damages for . . . breach of contract is an action at law in which a right to jury trial ordinarily exists." (*Raedeke v. Gibraltar Sav. & Loan Assn.* (1974) 10 Cal.3d 665, 671 [111 Cal.Rptr. 693, 517 P.2d 1157].)

### 4. *The gist of the action pertaining to the common stock is an equitable claim for declaratory relief or to quiet title*

Although, as noted *ante*, this is an appeal from a judgment in three consolidated cases—the Buckley Action, the Platypus Action, and the Corporations Code Action—Laurens's claim to a jury trial is premised primarily on the Platypus Action.[8] Laurens acknowledges that Platypus's "declaratory relief action to determine who properly owns the 30,625 shares of common stock" sounds "exclusivity in equity." However, he asserts a right to the jury trial based on his cross-complaint and on Alexandra and Sylvia's cross-complaint in the Platypus Action, and also on the fact that Sylvia sought money damages on her shareholder derivative claims in the Buckley Action.

Laurens advances three primary theories in support of his claim that the gist of the action to determine ownership of the common stock is legal, rather than equitable. First, he argues that Alexandra and Sylvia's declaratory relief claim cannot be used as a substitute for an action at law. To the extent Laurens contends that Alexandra and Sylvia were using a declaratory action in the place of a breach of contract action for damages, we reject that argument. The gist of their action was one to declare their rights to the common stock, based on the 1986 agreement, and to quiet title in that stock. True declaratory relief actions and actions to quiet title are equitable in nature. (*Fowler, supra,* 142 Cal.App.3d at p. 478; *Strauss, supra,* 157 Cal.App.3d at p. 812.)

Further, even if Alexandra and Sylvia's cross-complaint were construed as "coercive rather than declaratory in nature," the gist of their cross-complaint would not be one in which a "right [to a jury trial] would be guaranteed."

---

[8] Laurens properly does not claim that he had a right to a jury trial on the Siblings' Corporations Code section 709 claim brought in the Corporations Code Action. (See *Shahin v. Wawro* (1982) 136 Cal.App.3d 749, 754 [186 Cal.Rptr. 446] [stating that claims under Corporations Code section 709 "are equitable in nature"].)

With regard to the Buckley Action, Laurens concedes that Sylvia's shareholder derivative claim and her claims for an accounting and for a constructive trust are equitable and that the remaining claims asserted by Buckley are not at issue in this case. Laurens does claim that the fact that Sylvia sought damages on her shareholder derivative claims supports his right to a jury trial on the issue of the ownership of the common stock. We reject that argument for the reasons discussed below.

(*State Farm, supra,* 47 Cal.2d at p. 432.)[9] Rather, the gist of their action would be for specific performance of the 1986 Agreement. "A claim for specific performance is an equitable one." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1240 [19 Cal.Rptr.3d 416].) Therefore, we reject Laurens's argument that Alexandra and Sylvia were attempting to bring a breach of contract action for damages in the guise of a declaratory relief action.

Laurens also maintains that Alexandra and Sylvia's declaratory action cannot be used to defeat his right to a jury trial of the breach of contract claims he alleges in his cross-complaint, citing *State Farm, supra,* 47 Cal.2d 428 at pages 431–432. We agree with the Siblings that Alexandra and Sylvia did not bring their declaratory relief action in order to circumvent Laurens's right to a jury trial on his breach of contract claims, which are based on the premise that the Estate breached those Agreements by claiming rights under them. For the same reason, we reject Laurens's implicit argument, raised in reply, that while *State Farm* precludes a party from using the declaratory judgment procedure to circumvent his opponent's right to a jury trial, Laurens may "tack on" a legal claim to the declaratory action and thereby manufacture a right to a jury trial on equitable issues. Such a contention is contrary to the fundamental principle that, in determining the right to a jury, it is "not . . . the form of the action but rather . . . the nature of the rights involved and the facts of the particular case," that determine whether an action is legal or equitable. (*C & K Engineering Contractors, supra,* 23 Cal.3d at p. 9.)

We next consider Laurens's argument that he had a right to a jury trial because the gist of the action involving the common stock is one in which all of the parties "seek *possession* of stock." (Italics added.) Laurens acknowledges that there is no right to a jury trial in an ordinary quiet title action, citing *Strauss, supra,* 157 Cal.App.3d at page 812. However, he relies on cases involving real property that state that a quiet title action in which *possession* of the property is sought may be legal in nature, citing *Dills v. Delira Corp.* (1956) 145 Cal.App.2d 124, 130 [302 P.2d 397] (*Dills*).

The possession exception to the equitable nature of a quiet title action does not apply in this case for three reasons. First, the possession exception is premised on the fact that such an action is, in part, in a case

---

[9] We acknowledge that Alexandra and Sylvia's cross-complaint was "coercive," rather than "declaratory" in that it contained a prayer for relief that the court enter an "order requiring [Platypus] to register 49% of Laurens' common stock in the name of Estate of Franklin [F.] Offner." However, a request for such incidental relief does not alter the gist of the action. (*Olson v. Foster* (1941) 42 Cal.App.2d 493, 498 [109 P.2d 388].) In any event, a request for an order directing Platypus to register the shares was akin to a request for injunctive relief. "Actions seeking injunctive relief are, of course, equitable in nature." (3 Witkin, Cal. Procedure, *supra,* Actions, § 120, p. 187; e.g., *Arciero Ranches v. Meza* (1993) 17 Cal.App.4th 114, 125 [21 Cal.Rptr.2d 127].)

involving *real* property, an action for ejectment, which is legal in nature. (Comment, *Quieting Title Under Cal. Code Civ. Proc., § 738: Effect of Cross-Complaint on Right to Jury Trial* (1936–1937) 25 Cal. L.Rev. 565, 569 ["[i]f the action to quiet title is brought by a party out of possession against one claiming title who is in possession, the action . . . is in substance one of ejectment; and the defendant is entitled to a jury as of right"]; 3 Witkin, Cal. Procedure, *supra*, Actions, § 127, p. 194 [noting that quiet title action "is normally equitable, but becomes a legal action when it takes on the character of an *ejectment* proceeding, i.e., when the issue is the *right to recover possession lost by recent ouster*"].) This case, however, is an action involving *intangible personal* property. Laurens has cited no authority suggesting that the possession exception applies in this context. Further, assuming it is possible to maintain an action seeking to recover the "possession" of an intangible object, the gist of *this* action was a dispute over *ownership* of the stock, not *possession* of it. Third, Alexandra and Sylvia did not seek possession of the stock in their complaint. "[I]t is well settled that an action to establish title which does not include a prayer to obtain possession of the property is equitable in nature." (*Dills, supra,* 145 Cal.App.2d at p. 130.) Thus, we reject Lauren's argument that he was entitled to a jury trial because the gist of the action involved a quiet title dispute over *possession* of the common stock.

Finally, we also reject Laurens's contention that he was entitled to a jury trial because the Siblings were seeking "damages."[10] Laurens argues the Siblings sought damages in the Buckley Action in connection with "breach of the 1986 Security Agreement, a demand for resulting damages, and possession of collateral (i.e. the common stock) based on breach of that Agreement." Laurens conceded in his reply brief that this citation was in error as the complaint "references another dispute over a 1988 Security Agreement and not the 1986 . . . Agreement at issue here."

However, Laurens continues to assert in his reply brief that "the Siblings' complaint does request damages." This argument is unpersuasive. Laurens's only support for this argument is another citation to the prayer for relief in the Buckley Action—an action that sought damages based on wholly distinct equitable derivative claims and a breach of contract cause of action that Laurens acknowledges is not at issue in this appeal. Clearly, these claims in the Buckley Action did not create a right to a jury trial in the Platypus Action on the issue of who owns the common stock. This is particularly true in view of the fact that the request for damages on the breach of contract claim in the Buckley Action had been *dismissed* by the time the trial in this case took

---

[10] We note that Laurens claims "the Siblings" were seeking damages in the Buckley Action. However, Robin and Alexandra were not parties to the Buckley Action.

place, and the damages sought in the derivative action were based on *equitable*, not legal, claims (see part III.D, *post*).

We conclude Laurens was not entitled to a jury trial on the issue of ownership of the common stock of Platypus.[11]

B. *The common stock did not belong to Laurens as a matter of law*

Laurens claims that even assuming he had no right to a jury trial on the issue of the ownership of the common stock, the shares belonged to him as a matter of law. We disagree.

Laurens maintains he was entitled to the common stock as a matter of law based on recitals in an October 1997 interim agreement for appointment of directors (1997 Agreement) and the December 2001 interim shareholders' agreement (2001 Agreement). Laurens's claim is premised on the fact that the 1997 Agreement states that he owns the common stock in dispute, and that the 2001 Agreement does not list the Estate as owning any common stock. He argues that the 1997 Agreement was signed by Robin and that the Siblings were all parties to the 2001 Agreement. In denying Laurens's motion for a new trial on this ground, the trial court found that neither of these agreements was binding on the Estate because the Estate was not a party to either agreement.

Laurens concedes in his reply brief that he *"does not seek to have the recitals binding on the Estate* but rather binding on the plaintiffs in this case the Siblings who brought this action in the name of the Estate." (Italics added.)[12] Whether or not the recitals are binding on the *Siblings* is irrelevant to the issue of whether Laurens owns the shares as a matter of law, because the trial court concluded that the common shares were owned by the *Estate*. Because Laurens raises no claim that the Siblings' actions bound the Estate, we conclude that Laurens has not established that he owned the common stock as a matter of law.[13]

---

[11] In light of our conclusion, we need not consider the Siblings' alternative arguments for affirming the judgment.

[12] Notwithstanding this concession, Laurens also contends that two segments of Robin's trial testimony demonstrate that Robin was "ostensibly the agent of his father's estate" in drafting the 1997 and 2001 Agreements. However, Robin's trial testimony does not support this contention. Therefore, we reject Laurens's suggestion that Robin's actions in drafting the 1997 and 2001 Agreements bound the Estate to the recitals made therein.

[13] In light of our conclusion, we need not consider the Siblings' alternative grounds for rejecting Laurens's position.

C. *The trial court did not abuse its discretion in excluding an e-mail sent by Robin during settlement negotiations in which he mentioned the possibility of repurchasing 5,500 shares of preferred stock*

Laurens claims the trial court erred in excluding from evidence an e-mail sent by Robin to Sylvia, Alexandra and Laurens on October 1, 2001, in which Robin suggested that the Siblings repurchase 5,500 shares of Platypus preferred stock that had previously been sold to Paula Sandberg. The court excluded the e-mail pursuant to Evidence Code section 1152, which provides generally that offers to settle a claim, and negotiations pertaining to such offers, are inadmissible to prove liability on the claim.

1. *Relevant procedural history*[14]

Laurens filed a motion in limine to "preclude any evidence of or reference to e-mails between Laurens and his siblings in October 2001 regarding settlement negotiations on the grounds that such evidence constitutes an attempt by [his] siblings to resolve their disputes and is thus inadmissible under California Evidence Code section 1152." In his motion, Laurens contended that the e-mails constituted attempts "to negotiate a settlement of their disputes, including the dispute underlying this lawsuit . . . ."[15]

The Siblings filed an opposition to Laurens's motion in which they stated that although they agreed with Laurens that all October 2001 settlement e-mails should be excluded, they opposed Laurens's attempt to selectively offer just one of the series of e-mails in evidence. The Siblings also concurrently filed a separate motion in limine in which they noted that Laurens was seeking to introduce "a single isolated e-mail in which Robin suggests re-purchasing 5500 shares of preferred stock and then retiring that stock." The Siblings argued that Robin's October 1, 2001 e-mail was inadmissible because it was "part of a larger series of negotiations encompassing all aspects of the siblings' settlement negotiations." The trial court granted both Laurens's motion and the Siblings' motion. As a result of the rulings, all of the e-mails in question were excluded.

---

[14] We reject the Siblings' contention that Laurens's claim should be rejected on the ground that he has failed to provide an adequate record for review. Contrary to the Siblings' assertion in their brief, the appellant's appendix does contain: (1) the Siblings' motion in limine on which the trial court granted exclusion of the e-mail in question, (2) Laurens's motion to exclude various other e-mails sent during the same time period, and (3) the Siblings' opposition to Laurens's motion to exclude the e-mails. These documents were included as part of the Siblings' opposition to Laurens's motion for a new trial. We have also reviewed the additional declarations and documents the Siblings lodged in the trial court on this issue, which are contained in the respondent's appendix.

[15] The record does not contain the e-mails Laurens sought to exclude, and it is not clear from Laurens's motion whether he specified particular e-mails.

Laurens subsequently filed a motion to vacate the trial court's ruling on the Siblings' motion. In his motion, Laurens claimed that Evidence Code section 1152 did not preclude admission of Robin's October 1, 2001 e-mail. Laurens further argued that this e-mail was critical to prove that at the time the shares of preferred stock were issued to Sandberg, there was a tacit understanding among Laurens and his Siblings that Platypus would later reacquire the shares and retire them. The record does not indicate whether or not the trial court ruled on this motion.

Laurens later claimed in his motion for a new trial that the trial court's exclusion of the October 1, 2001 e-mail was erroneous and prejudicial. In its order denying the motion for a new trial, the trial court ruled that the e-mail was properly excluded under Evidence Code section 1152.

2. *Waiver*

The Siblings contend that Laurens has waived this claim because the record does not contain a ruling on Laurens' motion to vacate the ruling excluding the October 1, 2001 e-mail.

 Evidence Code section 354 provides generally that a ruling excluding evidence shall not serve as the basis for the reversal of a judgment unless the "substance, purpose, and relevance" of the excluded evidence was made known to the trial court. (Evid. Code, § 354, subd. (a).) However, this provision does not apply if the rulings of the trial court rendered compliance with this requirement futile. (Evid. Code, § 354, subd. (b).)

In the Siblings' motion in limine, they argued that the October 1, 2001 e-mail should be excluded along with the other e-mails at issue, pursuant to Evidence Code section 1152. The trial court granted the Siblings' motion in limine. Thus, the "substance, purpose, and relevance" of the e-mail was made known to the trial court before it excluded the evidence. (Evid. Code, § 354, subd. (a).) Laurens further made the trial court aware of the relevance of the e-mail through his subsequent motion to vacate. In addition, Laurens renewed his objection to the exclusion of the e-mail in his motion for a new trial, which the trial court denied.

Under these circumstances, we conclude Laurens adequately preserved his evidentiary objection to the exclusion of the October 1, 2001 e-mail. Accordingly, we reject the Siblings' contention that Laurens has waived this claim because the record does not contain a ruling on Laurens's motion to vacate.

3. *Standard of review*

 We have not found any California case law that specifically addresses the appropriate standard of review to apply in reviewing a trial

court's exclusion of evidence under Evidence Code section 1152. However, it is well established in California that, "a trial court's ruling on the admissibility of evidence generally is reviewed for abuse of discretion." (*People v. Griffin* (2004) 33 Cal.4th 536, 587 [15 Cal.Rptr.3d 743, 93 P.3d 344].) In addition, numerous courts have applied the abuse of discretion standard to the review of rulings pertaining to the admissibility of settlement offers, under analogous evidentiary provisions in other jurisdictions. (E.g., *Athey v. Farmers Ins. Exchange* (8th Cir. 2000) 234 F.3d 357, 362; *Alexander v. City of Evansville, Indiana* (7th Cir. 1997) 120 F.3d 723, 728; *Union River Associates v. Budman* (Me. 2004) 2004 ME 48 [850 A.2d 334, 340].) ▮▮ Accordingly, we conclude that the trial court's exclusion of Robin's e-mail, pursuant to Evidence Code section 1152, is reviewed for an abuse of discretion.

### 4. *Evidence Code section 1152 broadly precludes the introduction of statements made in the context of settlement negotiations*

Evidence Code section 1152, subdivision (a) provides: "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, *as well as any conduct or statements made in negotiation thereof*, is inadmissible to prove his or her liability for the loss or damage or any part of it." (Italics added.)

The Law Revision Commission comment accompanying the enactment of Evidence Code section 1152 specifically emphasized that the statute was drafted to include statements made in the context of settlement negotiations: "The words 'as well as any conduct or statements made in negotiation thereof' make it clear that statements made by parties during negotiations for the settlement of a claim may not be used as admissions in later litigation. This language will change the existing law under which certain statements made during settlement negotiations may be used as admissions. *People [ex rel. Dept. Public Works] v. Forster* [1962] 58 Cal.2d 257 [23 Cal.Rptr. 582, 373 P.2d 630] [(*Forster*)]. The rule excluding offers is based upon the public policy in favor of the settlement of disputes without litigation. The same public policy requires that admissions made during settlement negotiations also be excluded. . . . The rule of the *Forster* case is changed by [Evidence Code] Section 1152 because that rule prevents the complete candor between the parties that is most conducive to settlement." (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 1152, p. 519.)

▮▮ In light of this legislative history, courts have recognized that " 'the purpose of section 1152 [is] to promote candor in settlement negotiation . . . .' "

(*In re Marriage of Schoettgen* (1986) 183 Cal.App.3d 1, 8 [227 Cal.Rptr. 748, 227 Cal.Rptr. 758], quoting *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 297 [85 Cal.Rptr. 444, 466 P.2d 996] (*Warner*).) Evidence should be excluded under Evidence Code section 1152 where "The strong public policy favoring settlement negotiations and the necessity of candor in conducting them combine to require exclusion . . . ." (*C & K Engineering Contractors, supra*, 23 Cal.3d at p. 13.)

In *C & K Engineering Contractors*, the plaintiff contractor sued the defendant subcontractor on a promissory estoppel theory, based on the subcontractor's failure to perform in accordance with its bid on a subcontract. (*C & K Engineering Contractors, supra*, 23 Cal.3d at p. 5.) The subcontractor claimed that the promise was not enforceable because the contractor had known prior to submitting the bid that the defendant's bid contained an error. (*Ibid.*) The record contained conflicting testimony as to whether or not the contractor's chief estimator (Potts) had informed the subcontractor's chief estimator (Bass) during a telephone conversation that the subcontractor's bid was far lower than the other bids the contractor had received. (*Id.* at p. 12.)

The defendant sought to introduce additional testimony that, "during settlement discussions, [plaintiff's agent] admitted that Potts recounted to him a version of the Potts-Bass telephone conversation which was 'practically word for word' the same as Bass' own version." (*C & K Engineering Contractors, supra*, 23 Cal.3d at p. 13.) The Supreme Court noted that "[s]uch testimony might have impeached Potts' direct testimony to the effect that he advised Bass that defendant's bid was 'a hell of a lot' lower than the other bids." (*Ibid.*) The *C & K Engineering Contractors* court held that the trial court had properly excluded the evidence: "[U]nder Evidence Code section 1152, subdivision (a), 'conduct or statements made in negotiation [of compromise] . . . [are] inadmissible to prove . . . liability. . . .' Defendant relies on . . . *Forster* [*supra*,] 58 Cal.2d [at pages] 263–265, wherein we held that an independent and absolute admission of fact which is intended to admit liability is admissible even though it was made during the course of compromise negotiations. The *Forster* case, however, was decided prior to the enactment of section 1152, and the comment of the California Law Revision Commission make[s] it clear that the current language of this section changed the prior law under the *Forster* decision. According to the commission, '[the] rule of the *Forster* case is changed by Section 1152 because that rule prevents the complete candor between the parties that is most conducive to settlement.' [Citations.] [¶] In the present case, the excluded admission occurred during compromise negotiations in which both parties were discussing, and attempting to discover, the facts underlying their dispute." (*Ibid.*)

In this case, Robin sent an e-mail dated October 1, 2001 to Sylvia, Alexandra, Laurens, and Melody Harris,[16] in which he stated: "As a reminder, in 1997 we sold 5500 shares of stock to Paula Sandberg. More than three years have gone by. We should repurchase those shares and retire them."

This e-mail was one of numerous e-mails sent among the Siblings during September and October 2001, while they were attempting to resolve several interrelated disputes regarding Platypus. The disputes included the repayment of loans Dr. Offner had made to Laurens and Platypus, Laurens's misappropriation of money from the company for his personal use, the composition of the Platypus board of directors, and the Siblings' ownership stakes in the company. In some of the e-mails, the parties refer to various settlement positions, and in others, they refer to the possibility of litigation. For example, Laurens sent an e-mail to the Siblings on September 27, 2001 in which he attempted to resolve these disputes by requesting "a number from you guys for all debt and stock that will permanently conclude our business together."

In considering whether Robin's October 1, 2001 e-mail was excludable under these circumstances, we note that the issue of the ownership of all of the shares of Platypus, a closely held family company, would be critical information in evaluating Laurens's buyout offer and resolving the parties' many interrelated disputes. Further, Robin testified in a deposition that he sent the October 1, 2001 e-mail to rekindle faltering settlement negotiations. Thus, Robin's e-mail was sent at a time "during compromise negotiations in which both parties were discussing, and attempting to discover, the facts underlying their dispute." (*C & K Engineering Contractors, supra*, 23 Cal.3d at p. 13.) Therefore, the trial court did not abuse its discretion in excluding this e-mail.

We reject all of Laurens's arguments to the contrary. Laurens acknowledges that at the time Robin sent the e-mail in question, "the parties were in negotiations . . . ." However, he argues that Evidence Code section 1152 does not apply to this particular e-mail because the ownership of the shares referenced in the e-mail was not in dispute at the time Robin sent the e-mail, citing *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 481, footnote 3 [261 Cal.Rptr. 735] (*Price*) and *Warner, supra*, 2 Cal.3d 285.

In *Price*, the Court of Appeal concluded that certain letters discussing the plaintiffs' obligations under a contract were admissible, notwithstanding Evidence Code section 1152, because there was nothing in the record to

---

[16] Melody Harris was Platypus's general counsel.

suggest that there was any dispute regarding such obligations at the time the letters were written. (*Price, supra,* 213 Cal.App.3d at p. 481, fn. 3.) However, unlike in this case, the parties in *Price* were not negotiating *any* disputes at the time the letters were sent.

In *Warner,* the Supreme Court held that certain letters discussing the parties' interpretation of their duties under a contract were *excludable* pursuant to Evidence Code section 1152 because they were written after a controversy had arisen. (*Warner, supra,* 2 Cal.3d at p. 297.) While the *Warner* court suggested that evidence of the parties' interpretation of their obligations under a contract that existed prior to a dispute arising would be admissible, the court did not consider the admissibility of statements made in negotiation of an existing dispute. (*Id.* at pp. 296–297.) In short, unlike in *Price* and *Warner,* the parties in this case were attempting to resolve multiple related disputes at the time Robin sent the October 1, 2001 e-mail.

Further, even assuming that *Price* and *Warner* held that Evidence Code section 1152 applies only when there is a preexisting dispute regarding the particular issue referenced in the evidence in question, there is evidence that there was in fact such a dispute in this case. Just two weeks after Robin wrote the October 1, 2001 e-mail, Laurens sent an e-mail to the Siblings and Harris in which he broadly stated: "I have a long record of disputing how the preferred stock was handled. However, in the interest of repairing relationships and moving ahead, as previously stated, I am willing to negotiate all of this so everyone feels that they receive what was is [*sic*] fairly due them." Although Laurens asserts in his reply brief that this statement referred to a separate block of preferred stock, the wording of his e-mail is not so limited. We also reject Laurens's contention that Robin's trial and deposition testimony and Sylvia's trial testimony establish that as of October 2001 there was no dispute regarding the block of preferred shares at issue. At most, Robin's testimony suggests that he was willing to support the idea of reacquiring the stock and retiring the shares at that time. Neither Robin's nor Sylvia's testimony establishes that the parties had no dispute over the stock referenced in the October 1, 2001 e-mail.

Laurens also argues that "that the rule which excludes offers of compromise does not apply to statements which are in nowise connected with any attempt of compromise or are statements of fact independent of an offer of compromise." (*Moving Picture Machine Operators Union Local No. 162 v. Glasgow Theaters, Inc.* (1970) 6 Cal.App.3d 395, 402 [86 Cal.Rptr. 33] (*Moving Picture*).) The *Moving Picture* court relied on cases decided prior to the enactment of Evidence Code section 1152 for this proposition. (*Moving Picture, supra,* 6 Cal.App.3d at p. 402, citing *Smith v. Whittier* (1892) 95 Cal. 279, 297–298 [30 P. 529], *Kelly v. Steinberg* (1957) 148 Cal.App.2d 211, 219

[306 P.2d 955], *People ex rel. Dept. of Public Works v. Glen Arms Estate, Inc.* (1964) 230 Cal.App.2d 841, 863–864 [41 Cal.Rptr. 303], *Forster, supra*, 58 Cal.2d 257.)

Although statements that are truly independent of an offer of compromise are still admissible in the wake of the enactment of Evidence Code section 1152, the question which statements are "connected" and which statements are "independent" (*Moving Picture, supra*, 6 Cal.App.3d at p. 402), must be answered in light of the strong policy in favor of promoting candor during settlement negotiations embodied in the statute. For the reasons stated above, Robin's e-mail was "connected" to an attempt to compromise and was not "independent" (*ibid.*) of an offer to compromise.

Finally, Laurens's reliance on *Fieldson Associates, Inc. v. Whitecliff Laboratories, Inc.* (1969) 276 Cal.App.2d 770 [81 Cal.Rptr. 332] (*Fieldson*), is also misplaced. *Fieldson* involved a plaintiff's claim for breach of contract for the supply of display cartons and a defendant's cross-claim for lost profits based on a separate alleged purchase order agreement for coffee makers. (*Id.* at p. 771.) The plaintiff was allowed to introduce letters in which settlement of the contract claim was discussed, for the purpose of showing that the lack of discussion regarding the lost profits claim demonstrated the nonbonding nature of the purchase agreement for coffee makers. (*Id.* at p. 772.) The *Fieldson* court held that the letters were admissible for this limited purpose: "The letters were received for the sole purpose of showing the nonbinding nature of the 'purchase order' in order to defeat appellant's cross-complaint. When considered for that limited purpose, the letters had no bearing upon the primary validity of the claim asserted by respondent against appellant for the unused cartons. Evidence Code section 1152 provides that evidence that a party has offered to compromise a claim is inadmissible to prove liability for *that claim*." (*Ibid.*)

Thus, in *Fieldson*, the letters were admitted to prove a claim that was wholly distinct from the claim discussed in the letters themselves. In this case, in contrast, Laurens contends that the e-mail in question "was the key corroborating evidence that there was a tacit agreement to retire the 5,500 shares of preferred stock." In other words, Laurens sought admission of the e-mail to prove a claim that was specifically discussed in the e-mail. *Fieldson* is clearly distinguishable.

We conclude the trial court did not abuse its discretion in excluding Robin's October 2001 e-mail.

D. *The trial court properly determined Laurens's financial condition before it awarded punitive damages*

 Laurens claims the punitive damages awarded on Sylvia's shareholder derivative claims must be reversed because she failed to present sufficient evidence of his financial condition to the *jury*. We conclude that there is no right to a jury trial on equitable shareholder derivative claims under California law, even where punitive damages are sought.[17] We further conclude that the *trial court* awarded the punitive damages in this case and that the trial court's order directing Laurens to produce a current financial statement before it awarded the punitive damages precludes Laurens from claiming on appeal that the record contains insufficient evidence of his financial condition to support the award.[18]

1. *The record must contain meaningful evidence of a defendant's financial condition in order to sustain an award of punitive damages*

In *Adams v. Murakami* (1991) 54 Cal.3d 105, 109–110 [284 Cal.Rptr. 318, 813 P.2d 1348], the California Supreme Court outlined the standards an appellate court must employ when considering whether a punitive damages "award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." The *Adams* court began by noting that the purpose of punitive damages is "to punish wrongdoing" and to deter future misconduct, "either by the same defendant or other potential wrongdoers." (*Id.* at p. 110.) In determining whether the amount of damages serves those interests, a reviewing court must consider the importance of the nature of the defendant's wrongdoing, the amount of compensatory damages, and the *defendant's financial condition*. (*Ibid.*) Accordingly, the *Adams* court held, "an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition." (*Id.* at p. 109.)

 A trial court may order a defendant to produce his financial records in order to ensure that the record contains sufficient evidence of his financial condition to support an award of punitive damages. (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 608–609 [92 Cal.Rptr.2d 897] (*Mike Davidov Co.*).) In *Mike Davidov Co.*, the trial court held a bench trial on the plaintiff's fraud claim. After finding the defendant liable for fraud, the court

---

[17] We note that the issue whether Laurens is entitled to a jury trial is one of law, which we review de novo. (See part III.A.1., *ante*.)

[18] In light of our conclusion that Laurens had no right to a jury trial, we need not consider Sylvia's contention that Laurens waived any right to a jury trial that he had by requesting that the derivative action be tried to the court.

"ordered defendant to produce all records regarding his net worth by 9:00 a.m. the next day and to turn over all such records to plaintiff's counsel." (*Id.* at p. 603.) The defendant failed to comply with the order, and the trial court entered an award of punitive damages. (*Ibid.*) On appeal, the defendant claimed that the lack of sufficient evidence of his financial condition required reversal of the punitive damage award. The *Mike Davidov Co.* court rejected this contention: "[D]efendant was ordered to produce his financial records so that the trial court could make an evaluation of whether any particular punitive damage award would have the required deterrent effect without being overly burdensome. This order was never rescinded, nor has defendant argued on appeal that it was improper. Therefore, by failing to bring in any records which would reflect his financial condition, despite being ordered to do so, and by failing to challenge that ruling on appeal, defendant has waived any right to complain of the lack of such evidence." (*Id.* at pp. 608–609.)

 2. *Under California law, there is no right to a jury trial on equitable shareholder derivative claims even where punitive damages are sought on such claims*

"California entertains no right to jury trial in stockholders' derivative actions." (*Rankin v. Frebank Co.* (1975) 47 Cal.App.3d 75, 92 [121 Cal.Rptr. 348] [reviewing California case law and declining to follow federal cases holding that the federal Constitution guarantees a right to jury trial in shareholder derivative claims]; *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 127 [84 Cal.Rptr.2d 753] ["A shareholder derivative suit is an action in equity"].) Further, under California law, a trial court may impose punitive damages in an equitable action. (*Rivero v. Thomas* (1948) 86 Cal.App.2d 225, 239 [194 P.2d 533] [noting that " '[a]s a general rule, courts of equity will not award exemplary damages, although this rule is not without exception,' [citation]" and affirming, as modified, punitive damages awarded by trial court in an equitable action].)[19]

Laurens acknowledges that shareholder derivative actions are equitable in nature, but contends that he "had a right to jury trial on punitive damages even though that claim was incidental to equitable claims." Thus, Laurens appears to be arguing that he was entitled to a jury trial on Sylvia's

---

[19] Laurens does not claim that punitive damages are not recoverable in a shareholder derivative action. Therefore, we assume, without deciding, that punitive damages may be recoverable in a shareholder derivative action. Although we have found no California case law on point, we note that there are cases from other states holding that punitive awards may be recoverable in shareholder derivative actions where the underlying action merits such an award. (E.g., *Longwell v. Custom Benefit Programs Midwest, Inc.* (S.D. 2001) 2001 SD 60 [627 N.W.2d 396, 400]; *Holden v. Construction Machinery Co.* (Iowa 1972) 202 N.W.2d 348 [citing cases].)

shareholder derivative claims because she sought punitive damages on those claims.[20]

 This argument is contrary to the rationale underlying the California Supreme Court's decision in *C & K Engineering Contractors, supra,* 23 Cal.3d at page 11, in which the court held, "[T]he addition . . . of a prayer for damages does not convert what is essentially an equitable action into a legal one for which a jury trial would be available." In *C & K Engineering Contractors,* one of the issues was whether there was a right to a jury trial on a complaint that sought damages premised on the equitable theory of promissory estoppel. The Supreme Court held that the plaintiff had no right to a jury trial: "In the present case, the complaint purports to seek recovery of damages for breach of contract, in form an action at law in which a right to jury trial ordinarily would exist. [Citations.] As we have seen, however, the complaint seeks relief which was available only in equity, namely, the enforcement of defendant's gratuitous promise to perform its bid through application of the equitable doctrine of promissory estoppel. . . . [¶] . . . [¶] The foregoing general principles do not alter our conclusion that the present action is, essentially, one recognized only in courts of equity and, despite plaintiff's request for damages, is not an 'action at law' . . . ." (*C & K Engineering Contractors, supra,* 23 Cal.3d at pp. 9–10.)

Similarly, in this case, Sylvia's request for punitive damages did not convert her equitable shareholder derivative claim into a legal claim on which Laurens would be entitled to a jury trial.

Laurens cites *Malone v. Norwest Financial California Inc.* (E.D. Cal. 2000) 245 B.R. 389 (*Malone*), in support of his argument that he had a right to a jury trial in this case, under the California Constitution. In *Malone,* the bankruptcy court considered whether the plaintiff was entitled to a jury trial on his statutory claim under the *federal* Constitution. (*Malone, supra,* at p. 399.) The court noted that the "most important part of the analysis," in determining whether the plaintiff had such a right is "whether the relief sought is legal or equitable in nature." (*Ibid.*) The *Malone* court concluded, "Because plaintiffs' suit seeks punitive damages for the alleged violation of their rights under [the statute], they seek a remedy legal in character and thus are entitled to a jury trial as to that claim." (*Ibid.*)

---

[20] To the extent Laurens claims he was entitled to a jury trial solely on the issue of punitive damages, we reject this claim as well. Such a bifurcated procedure would be inconsistent both with the fact that there is no separate cause of action for punitive damages—they "are only ancillary to a valid cause of action" (*Jackson v. Johnson* (1992) 5 Cal.App.4th 1350, 1355 [7 Cal.Rptr.2d 482])—and with the statutory command that evidence of a defendant's financial condition necessary to support a punitive damages award be presented to the "*same* trier of fact" that found the defendant liable. (Civ. Code, § 3295, subd. (d), italics added.)

The analysis employed in *Malone* to determine the right to a jury trial under the federal Constitution is contrary to that of the *C & K Engineering Contractors* to determine the right to a jury trial under the California Constitution. This case does not involve the question of the right to a jury trial under the federal Constitution. Therefore, we will not apply the reasoning of the *Malone* court to this case.

Laurens also cites *Looney v. Superior Court* (1993) 16 Cal.App.4th 521 [20 Cal.Rptr.2d 182] in support of his claim that he had a right to a jury trial in this case. However, *Looney* is clearly distinguishable from this case. In *Looney*, the court stated that there was a right to a jury trial on a request for punitive damages (*id.* at p. 538, fn. 18) where the plaintiffs "allege[d] claims for both medical negligence and fraud in the treatment of their conditions." (*Id.* at p. 526.) Medical negligence and fraud are *legal* claims to which the right to a jury trial attaches. (*State Farm Fire & Casualty Co. v. Cooperative of American Physicians, Inc.* (1984) 163 Cal.App.3d 199, 206 [209 Cal.Rptr. 251] [medical malpractice]; *Raedeke v. Gibraltar Sav. & Loan Assn., supra,* 10 Cal.3d at p. 671 [fraud].) The court in *Looney* did not suggest that there is a right to a jury trial of *equitable* claims when punitive damages are requested.

We conclude that there is no right to a jury trial of equitable shareholder derivative claims in California, even where punitive damages are sought on such claims.

3. *Sylvia's shareholder derivative claims, and her request for punitive damages ancillary to those claims, were tried to the court*

Sylvia brought shareholder derivative claims on behalf of Platypus seeking compensatory and punitive damages against Laurens for his conversion of corporate property and his commission of fraud as a corporate fiduciary. At the close of the trial, the jury, acting in an advisory capacity, found Laurens liable on the derivative fraud and conversion claims. The jury also found by clear and convincing evidence that Laurens had committed oppression, fraud or malice, and awarded $150,000 in punitive damages against him. After dismissing the jury, the trial court stated that it agreed with the jury that Laurens had converted $261,000 of corporate funds to his personal use, that he had failed to repay a $240,000 loan made to the corporation, and that he took $87,104 in unauthorized salary.

The trial judge then stated, "[O]ne thing I want to do by tomorrow morning is get a, a complete financial statement of Mr. Laurens Offner presented to the Court for the Court's review as I review the jury verdict and make *my final decision on punitive damages*." (Italics added.) The court ordered Laurens to

produce a current financial statement under penalty of perjury. The next day, Laurens submitted a financial statement to the court. Laurens's counsel objected to the admission of the financial statement on the ground that the jury had been dismissed without Sylvia having presented evidence of Laurens's current financial condition. The court overruled the objection, reviewed Laurens's financial statement, and allowed argument on the issue of whether punitive damages should be awarded. The trial court stated that it agreed with the advisory jury's findings that Laurens had acted with malice, oppression and fraud, and with its award of punitive damages in the amount of $150,000. Accordingly, the court imposed punitive damages in the amount of $150,000.

We reject Laurens's argument that the record of his financial condition is insufficient because the trial court directed him to produce his financial statement only after dismissing the jury. For the reasons discussed above, the *trial court* was the proper trier of fact of Sylvia's equitable shareholder derivative claims and her request for punitive damages on those claims. Laurens's financial statement was properly before the court at the time it made its final decision to award punitive damages in the amount of $150,000.

Apart from his claim that it was the jury that was required to have sufficient evidence of his financial condition, Laurens raises no other challenge to the court's order directing him to produce a current financial statement. The order in this case is similar to the order issued in *Mike Davidov Co., supra,* 78 Cal.App.4th 597. Laurens produced the financial statement to the court and the court reviewed the statement before it imposed punitive damages. Therefore, assuming there is any insufficiency in the record as to Laurens's financial condition, such insufficiency would be attributable solely to Laurens's failure to comply with a court order. (*Id.* at pp. 608–609.) We conclude that the trial court's order directing Laurens to produce a current financial statement precludes Laurens from claiming on appeal that the record contains insufficient evidence of his financial condition. (*Ibid.*)

IV.

CONCLUSION

Laurens was not entitled to a jury trial on the question of who owned Platypus's common stock. The trial court did not abuse its discretion in excluding from evidence, pursuant to Evidence Code section 1152, an e-mail sent by Robin regarding the repurchase of 5,500 shares of Platypus's preferred stock. The trial court properly determined Laurens's financial condition before it awarded punitive damages.

## V.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Nares, J., concurred.