Filed 4/21/25  The Whiting-Turner Contracting Co. v. 250 Fourth Development CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE WHITING-TURNER CONTRACTING COMPANY,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>250 FOURTH DEVELOPMENT LP et al.,<br><br>      Defendants and Appellants. | A168492<br><br><br>(City & County of San Francisco Super. Ct. No. CGC-17-559979) |

In this construction contract dispute, 250 Fourth Development LP, Ganendra Singh, GMS Development, Inc., Paradigm Hotels Group, LLC, and Mint Development, LP (collectively, 250 Fourth)[1] appeal from the trial court's $5,386,417 judgment in favor of general contractor The Whiting-Turner Contracting Company (Whiting-Turner).  After a 79-day bench trial, a referee found that 250 Fourth materially breached the contract by wrongfully terminating Whiting-Turner.  The referee also rejected breach of contract and tort claims that 250 Fourth raised in its cross-complaint.  250 Fourth challenges the referee's evidentiary rulings, its interpretation of the contract, and its

---

[1] Singh owns and controls 250 Fourth Development LP, as well as GMS Development, Inc., Paradigm Hotels Group, LLC, and Mint Development LP.  All are alter egos of 250 Fourth.

1

quantification of, and refusal to apportion, damages. We affirm the judgment.

## BACKGROUND

### A.

In August 2015, 250 Fourth entered a $36 million "Guaranteed Maximum Price" agreement with Whiting-Turner to construct a twelve-story hotel in San Francisco. The hotel was intended to be a Virgin brand hotel on completion.[2]

The construction contract primarily consists of two parts: (1) a modified "AIA Document A102-2007 Standard Form of Agreement Between Owner and Contractor where the basis of payment is the Cost of the Work Plus a Fee with a Guaranteed Maximum Price"; and (2) a modified "AIA Document A201-2007 General Conditions of the Contract for Construction."

The contract required completion of the work by Whiting-Turner for the "Cost of the Work" plus a 3 percent fee—but not more than the agreed upon maximum price, subject to adjustments by change order. In the event of a dispute between 250 Fourth and Whiting-Turner, Whiting-Turner was generally obligated—subject to exceptions found in section 9.7 and article 14 of the General Conditions—to continue performance pending final resolution of its claim.

The contract required that the project be completed by May 10, 2017 and provided that 250 Fourth was entitled to liquidated

---

[2] 250 Fourth and Virgin Hotels were eventually parties to a separate action involving the hotel management agreement, to which Whiting-Turner was not a party: *Virgin Hotels San Francisco, LLC v. 250 Fourth Development, L.P.* (City & County of San Francisco Superior Court Case No. CGC-20-584350; the Virgin lawsuit). The Virgin lawsuit went to trial in May 2022.

damages if Whiting-Turner "fails to achieve Substantial Completion of the Work within the Contract Time."

Section 8.3.1 of the General Conditions further addressed construction delays as follows: "[Whiting-Turner] shall advise [250 Fourth] promptly in writing of any delay in the Work (including delays in receipt of permits or approvals, or of drawings from Architect), and the cause of such delay. [Whiting-Turner] shall take all prudent steps necessary to minimize the delay and shall diligently proceed to complete the Work as required by the Contract Documents. [Whiting-Turner]'s written notice to [250 Fourth] required by this Paragraph 8.3.1 *shall not limit any right [250 Fourth] may otherwise have to seek any and all legal and/or equitable remedies* against [Whiting-Turner] *based on any delay that is not attributable to an Excusable Delay.* [Whiting-Turner] further acknowledges and agrees that adjustments in the Contract Time will be permitted for a delay *only to the extent such delay (i) is not caused, or could not have been anticipated, by [Whiting-Turner],* (ii) could not be limited or avoided by [Whiting-Turner]'s timely notice to [250 Fourth] of the delay or reasonable likelihood that a delay will occur, and (iii) is of a duration not less than one (1) day, *and the Contract Sum shall be equitably adjusted to compensate [Whiting-Turner] for any direct costs incurred by [Whiting-Turner] resulting from such delay.*" (Italics added.)

250 Fourth was required to retain an architect, timely provide complete and coordinated drawings and specifications for construction, and obtain all project permits. At the time of contracting, 250 Fourth and Whiting-Turner acknowledged that project design was incomplete and that only some of the necessary permits had been obtained. Considering this circumstance, certain scopes of work were intended to be designed-to-budget. To that end, section 5.2.5 of the agreement provides: "To the extent that the Drawings and Specifications are

3

anticipated to require further development by the Architect, the Contractor has provided in the Guaranteed Maximum Price for such further development consistent with the Contract Documents and reasonably inferable therefrom. *Such further development does not include such things as changes in scope, systems, kinds and quality of materials, finishes or equipment, all of which, if required, shall be incorporated by Change Order.*" (Italics added.)

The parties also specifically incorporated a list of qualifications as an attachment (Exhibit B) to the General Conditions, which provided: "[Whiting-Turner] shall be included in the [Mechanical-Electrical-Plumbing/Fire Protection] design meetings to ensure modifications to the existing design and layout are in alignment with the project budget. Current [guaranteed maximum] pricing includes the installation of [Mechanical-Electrical-Plumbing/Fire Protection] systems that conform to local building codes. *In the event the Design Team and or Owner makes any decisions exceeding the budgeted value, [Whiting-Turner] shall be allowed to submit for additional costs.*" (Italics added.)

In other words, Whiting-Turner and 250 Fourth agreed to include a target value in the guaranteed maximum price because design was incomplete. And, if the final design caused that budget to be exceeded, Whiting-Turner would be entitled to submit a change order for additional costs and time.

**B.**

During construction, there were significant delays in the progression of the work and the project was not substantially completed by May 10, 2017, the target deadline. The parties disputed who was responsible. Whiting-Turner blamed 250 Fourth's delay in providing final design and construction documents. 250 Fourth faulted delays from Whiting-Turner's subcontractors—particularly in the areas of plumbing, drywall

4

and framing, the exterior curtain wall system, and storefront glazing.

Whiting-Turner submitted change orders to 250 Fourth, which sought increased compensation for costs purportedly attributable to 250 Fourth's incomplete and inadequate design and related delay. The parties agreed on the compensation payable to Whiting-Turner for some change orders, but disputes regarding others were not settled—including additional costs necessitated by changes to the original plans for plumbing work (CN 39), HVAC work (CN 67), fuel oil piping work (CN 68), glass upgrades (CN 69), and the extension of the work beyond May 2017 (CN 296A, and CN 296B). 250 Fourth also refused to release retention funds to Whiting-Turner.

In July 2017, while construction remained ongoing, Whiting-Turner sued 250 Fourth—seeking damages for breach of contract and declaratory relief. Whiting-Turner alleged that 250 Fourth breached the construction contract by failing to provide complete and coordinated design drawings and permits, by changing significant design components, by demanding changes to room designs after mock ups were approved and three floors of rooms had been roughed in, by failing to secure needed site access, and by excluding Whiting-Turner from budgeting and design meetings, and by failing to compensate Whiting-Turner for its (and its subcontractors') extracontractual costs. In its declaratory relief claim, Whiting-Turner sought to be excused from further performance due to 250 Fourth's material breach of its obligations.

The parties stipulated that retired Superior Court Judge Bonnie L. Sabraw would try the matter and issue a statement of decision as a referee (Code Civ. Proc., § 638). In the fall of 2017, the referee denied Whiting-Turner's motion seeking trial precedence (*id.*, § 1062.3) on its declaratory relief claim.

5

On December 15, 2017, Whiting-Turner's project manager for the 250 Fourth project, Jasdeep Mangat, notified Singh that Whiting-Turner was prepared to exercise its right to stop work, under section 9.7 of the General Conditions,[3] if 250 Fourth did not tender immediate payment on Whiting-Turner's unpaid progress payment application no. 25—which had issued two months earlier.  Later that month, 250 Fourth issued payment, but in an amount approximately $100,000 less than the amount set forth in Whiting-Turner's application.  Additionally, payment on Whiting-Turner's October and November progress payment applications (numbers 26 and 27) remained unpaid.

On January 10, 2018, Whiting-Turner sent 250 Fourth a letter entitled "Termination By Contractor For Delay" (January 10 letter) wherein Whiting-Turner asserted that 250 Fourth was not meeting its contractual obligations and had caused substantial delay of the work.  Whiting-Turner stated, "in the period between April 6, 2017 and October 30, 2017, the Owner delayed Whiting-Turner by 208 calendar days.  Through the date of this correspondence, Whiting-Turner has been delayed in excess of 250 days by the Owner, more than twice the amount of delay necessary to trigger Whiting-Turner's right to terminate performance pursuant to Article 14.1.2."[4]  The letter indicated that it was a seven-day notice of termination of performance and

_____

[3] Section 9.7 of the General Conditions permitted Whiting-Turner to suspend its work for nonpayment.

[4] Section 14.1.2 of the General Conditions provides: "The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 14.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less."

stated that Whiting-Turner intended to "vacate its site office" effective January 17, 2018.  Singh understood the January 10 letter to be a notice of intent to terminate, not an immediate termination.

In response to the January 10 letter, Singh wrote to Whiting-Turner two days later, asking Whiting-Turner to postpone termination and meet with 250 Fourth to discuss a resolution.  Singh asserted that Whiting-Turner did not have a contractual basis for termination under Section 14.1.2.

On January 15, 2018, Whiting-Turner disagreed with Singh's assertions regarding its bases for termination or suspension and discussed numerous failed efforts to resolve payment issues.  But it agreed to meet to attempt to resolve their disputes.  It further stated:  "Whiting-Turner is suspending any further work on the Project as of January 17, 2018; Whiting-Turner will agree to postpone termination by ten days, to Friday January 26, 2018, pending the parties' meeting or until such date that it receives notice that [250 Fourth] has no desire for such a meeting."

On January 18, 2018, Whiting-Turner gave formal notice to 250 Fourth that work had been suspended as of the end of the day January 17, 2018, confirmed the parties' plan to meet the following week, and stated Whiting-Turner's hope that they could resolve its claim and "move forward to complete your project."

On January 25, 2018, the parties held a settlement meeting.  The next day, Whiting-Turner's Senior Vice President, Troy Caldwell, sent an email to Singh, which attached a letter (the Caldwell letter) setting forth Whiting-Turner's conditions for moving forward with the Project.[5]

---

[5] The referee ruled that the Caldwell letter was inadmissible as an offer to compromise (Evid. Code, § 1152).

7

On January 30, 2018, 250 Fourth sent Whiting-Turner its "Notice of Termination for Cause," which was effective immediately. 250 Fourth stated it was terminating Whiting-Turner for cause, under section 14.2.1,[6] based on, inter alia, Whiting-Turner's improper suspension and abandonment of its obligation to continue the work. 250 Fourth then engaged the Austin Company to complete the project.

## C.

250 Fourth filed a cross-complaint against Whiting-Turner, alleging causes of action for breach of contract, fraud, negligent misrepresentation, intentional interference with prospective economic relations, intentional interference with contractual relations, negligent interference with prospective economic relations, and express indemnity. In its breach of contract cause of action, 250 Fourth alleged that Whiting-Turner breached the contract by, among other things, abandoning the project no later than January 17, 2018 without valid contractual justification. It also alleged that Whiting-Turner was liable for liquidated damages for failing to substantially complete the project within the contracted time. In its first amended complaint, Whiting-Turner added new allegations that 250 Fourth breached the contract by terminating Whiting-Turner without contractual justification.

---

[6] 250 Fourth was entitled to terminate "for cause" if Whiting-Turner "repeatedly refuses or fails to supply enough properly skilled workers or proper materials" or "otherwise is guilty of substantial breach of a provision of the Contract Documents." To terminate on that basis, "[250 Fourth] *upon certification by the Initial Decision Maker that sufficient cause exists to justify such action*, may without prejudice to any other rights or remedies . . . *and after giving* [Whiting-Turner] . . . *seven days' written notice*, terminate employment of [Whiting-Turner]." (Italics added.)

The case proceeded to a bench trial before the referee. The referee issued a proposed statement of decision, to which 250 Fourth filed objections, and the referee issued a corrected statement of decision.

In its corrected statement of decision, the referee found that 250 Fourth breached its contract obligations to Whiting-Turner. It explained: "While the evidence establishes fault and problems by both parties in moving towards completion of the Project in accordance with their obligations under the Contract documents, the Court finds that the weight of the evidence supports findings that Whiting-Turner had a legitimate basis for the notice of termination and suspension of work in January 2018; that Whiting-Turner did not abandon the Project; and that 250 Fourth's termination of Whiting-Turner on January 30, 2018, breached the [contract]."

The referee found explicitly: "The lack of complete and approved design and construction documents caused substantial delays in the critical path of the Project. This included changes made in the [Mechanical-Electrical-Plumbing] drawings which changed the scope, systems, kinds, and quality of materials, finishes or equipment. As a result of these changes, by March 2016, Whiting-Turner had submitted numerous [change orders] to 250 Fourth, including [CN 39, CN 67, and CN 68]. Despite the 'designed-to-budget' qualifications set forth in the GC Contract, 250 Fourth did not approve these [change orders] and many others." "[Singh's testimony in the Virgin lawsuit] demonstrates that there were material issues involving design completion, redesign, and modifications, which resulted in substantial delay to the Project. . . . [¶] . . . [¶] These delays, coupled with the lack of compliance with payment obligations . . . , supported Whiting-Turner's decision to provide a 7-day notice of termination on January 10, 2018."

9

The referee also stated: "While there is no dispute certain delays and issues with progression of the Project were contributed to by Whiting-Turner, the assertion by 250 Fourth that Whiting-Turner bears all responsibility for the delays is contradicted by the evidence presented in this case as well as Singh's testimony in the Virgin Lawsuit. In that action, Singh testified that <u>all</u> delays to the Project were caused by continuous design changes made by Virgin and that the Virgin design changes resulted in a 'nightmare' that continued well after the original completion date of May 10, 2017."

The referee further found that 250 Fourth failed to meet its burden of establishing that Whiting-Turner abandoned the project or otherwise materially breached the contract before 250 Fourth's termination. The referee found Whiting-Turner's January 10 letter met the contractual requirements and did not constitute an abandonment or material breach of the contract. The referee explained: "The evidence presented supports a finding that Whiting-Turner *never carried out* the termination, which had been postponed twice during the parties' settlement negotiations and was still on hold awaiting 250 Fourth's response to Whiting-Turner's January 26, 2018 settlement offer. . . . [T]he parties' belated characterization of the termination notice . . . does not overcome the evidence that the termination had been postponed during settlement negotiations, which were then interrupted by 250 Fourth's own purported termination for cause. [¶] As such, . . . the [January 10 letter] cannot be construed as a material breach or an abandonment." (Italics added.)

The referee further found that Whiting-Turner did not abandon the project by suspending work effective January 18, 2018 because 250 Fourth had failed to make timely payment on Whiting-Turner's October and November 2017 payment applications and because "by definition, a suspension implies that work will resume at some point."

10

Furthermore, the referee explicitly found that 250 Fourth did not have the right to terminate Whiting-Turner because none of the circumstances allowing termination for cause (found in § 14.2.1) arose. Accordingly, and because 250 Fourth failed to comply with the contractual requirements (found in § 14.2.2) that it provide seven days' written notice and obtain certification from the initial decision maker, "250 Fourth materially breached the contract by wrongfully terminating Whiting-Turner." Because the evidence did not support a finding that, as of January 30, 2018, Whiting-Turner had abandoned or repudiated the agreement, 250 Fourth's failure to comply with the contract's terms was not excused.

The referee awarded Whiting-Turner damages for the amount owed on the unpaid (October and November 2017) progress payment applications, unpaid contract retention, disputed and undisputed change orders that had not been paid, and additional costs Whiting-Turner incurred for drywall work inefficiencies due to 250 Fourth's incomplete design. The trial court entered judgment in Whiting-Turner's favor in the total amount of $5,386,417.

## DISCUSSION

### A.

A judgment based on a referee's statement of decision is treated as if the action had been heard by the court (Code Civ. Proc., § 644, subd. (a)) and is reviewed on appeal using the same rules that apply to a decision by the trial court. (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513 (*Central Valley*).) Thus, we independently review questions of law and review the referee's factual findings for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

In this appeal, 250 Fourth seeks to avoid the substantial evidence standard of review by foregoing explicit challenges to

11

the referee's factual findings. Instead, 250 Fourth raises a series of challenges to the referee's evidentiary rulings, its interpretation of the contract, and its quantification of, and refusal to apportion, damages. Nonetheless, we must presume the trial court's judgment is correct and that the evidence is sufficient to support the trier of fact's factual findings. (*Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443; *Boeken v. Philip Morris, Inc*. (2005) 127 Cal.App.4th 1640, 1667.) The appellant bears the burden of affirmatively demonstrating both error and prejudice. (*Howard,* at p. 443; *Gould v. Corinthian Colleges, Inc*. (2011) 192 Cal.App.4th 1176, 1181.) To do so, the appellant must provide an adequate record (*Hotels Nevada, LLC v. L.A. Pacific Center, Inc*. (2012) 203 Cal.App.4th 336, 348) along with cogent legal argument and citation to the record and supporting authority. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 (*Hernandez*); *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246; Cal. Rules of Court, rules 8.204(a)(1)(B)-(C).)

To recover on a cause of action for breach of contract, a plaintiff must prove: (1) existence of the contract; (2) the plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4) damages caused by the breach. (*Miles v. Deutsche Bank National Trust Co*. (2015) 236 Cal.App.4th 394, 402.)

"California law recognizes that a contract may be breached by nonperformance, by repudiation, or a combination of the two." (*Central Valley, supra,* 162 Cal.App.4th at p. 514.) When one party commits a material breach of a contract, the other party is thereafter excused from performance under the contract. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277; *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1275 & fn. 6.) "There can be no *actual* breach of a contract until the time specified therein for performance has arrived." (*Taylor v.*

*Johnston* (1975) 15 Cal.3d 130, 137 (*Taylor*).)  By contrast, "an anticipatory breach of contract occurs when the contract is repudiated by the promisor before the promisor's performance under the contract is due."  (*Central Valley*, at p. 514; accord, Civ. Code, § 1440.)

We begin with the challenged evidentiary rulings.

## B.

250 Fourth contends that, after the close of evidence, the referee erred in taking judicial notice of testimony Singh gave at trial in the Virgin lawsuit.  It raises no challenge to the referee's decision to take judicial notice of the transcripts as court records (Evid. Code, § 452, subd. (d)) but asserts it was error to notice the truth of Singh's statements contained therein.  250 Fourth fails to meet its burden of establishing a prejudicial abuse of discretion.  (*Hart v. Darwish* (2017) 12 Cal.App.5th 218, 223 [standard of review]; *Gould v. Corinthian Colleges, Inc., supra,* 192 Cal.App.4th at p. 1181 [appellant's burden to demonstrate prejudice].)

## 1.

After the close of testimony, Whiting-Turner learned that Singh's later testimony in the Virgin lawsuit contradicted evidence 250 Fourth had presented in this case.  Whiting-Turner asked the referee to either (a) take judicial notice of court records from the Virgin lawsuit, pursuant to Evidence Code section 452, subdivision (d); or (b) reopen evidence so that Whiting-Turner could recall Singh for further cross-examination.

In particular, Whiting-Turner asked the referee to notice an excerpt of Singh's testimony and 250 Fourth's post-trial brief in the Virgin lawsuit.  It was apparent from Whiting-Turner's request for judicial notice that it sought to have the referee notice the truth of the statements within the transcript, not merely the *existence* of the records or the fact that Singh testified.  250

13

Fourth explicitly stated it had no objection. The referee granted Whiting-Turner's request but stated that, with respect to 250 Fourth's post-trial brief, it could not "take judicial notice of the truth of matters asserted."

**2.**

By failing to raise an objection below, 250 Fourth forfeited its current argument that it was error to take notice of Singh's testimony in the Virgin lawsuit for its truth. (See Evid. Code, § 353, subd. (a) [judgment shall not be reversed "by reason of the erroneous admission of evidence unless: [¶] . . . [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"]; *Pereda v. Atos Jiu Jitsu LLC* (2022) 85 Cal.App.5th 759, 763, fn. 1 [failure to object to propriety of judicial notice forfeits challenge on appeal].)

In any event, 250 Fourth's argument fails on the merits. Judicial notice is a substitute for formal proof. (*Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564.) True, a court's ability to notice statements within court records for their truth is limited by the hearsay rule. (*In re Vicks* (2013) 56 Cal.4th 274, 314.) But 250 Fourth ignores the hearsay exception applicable to a party's admissions (Evid. Code, § 1220). (See *Hart v. Darwish, supra*, 12 Cal.App.5th at p. 224; *North Beverly Park Homeowners Assn. v. Bisno* (2007) 147 Cal.App.4th 762, 778 ["hearsay rule applies to statements contained in judicially noticed documents, and precludes consideration of those statements for their truth unless an independent hearsay exception exists"].) This division has previously made clear that "a court may take judicial notice of a party's admissions or concessions in [other] cases where the admission ' "cannot reasonably be controverted," ' such as in answers to interrogatories or requests for admission, or in affidavits and declarations filed on the party's behalf." (*Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 218, fn.

14

11; accord, *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 485.)

Putting aside the propriety of judicial notice, 250 Fourth does not explain why, had it insisted on formal proof, Singh's inconsistent testimony in another matter would be barred by the hearsay rule.  In fact, 250 Fourth concedes that Singh's testimony in the Virgin lawsuit could have been used to impeach Singh had evidence been reopened.  (See Evid. Code, §§ 1220, 1222, 1224; *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 523-524 [admissions exception applies to a party's testimony in another matter].)  This is likely why it refrained from objecting to Whiting-Turner's judicial notice request—to avoid a burdensome and damaging cross examination of Singh.  In short, 250 Fourth cannot demonstrate prejudicial error.  (See Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); *People v. Rains* (1999) 75 Cal.App.4th 1165, 1170.)

## C.

250 Fourth also maintains that the referee abused its discretion by excluding the Caldwell letter as an offer to compromise (Evid. Code, § 1152).  (See *Caira v. Offner* (2005) 126 Cal.App.4th 12, 30 (*Caira*) [standard of review].)  We disagree.

## 1.

"Parties should be encouraged to make offers without fear that they will be treated as an admission of either liability or the minimal value of a claim."  (*Heimlich v. Shivji* (2019) 7 Cal.5th 350, 360.)  Accordingly, Evidence Code section 1152 generally makes "offers to settle a claim, and negotiations pertaining to such offers" inadmissible to prove liability on the same claim.  (*Caira, supra*, 126 Cal.App.4th at p. 30.)

Settlement communications may be admitted to prove a claim that is "wholly distinct" from the claim discussed therein.  (*Caira, supra*, 126 Cal.App.4th at p. 36; accord, *Fieldson*

15

*Associates, Inc. v. Whitecliff Laboratories, Inc.* (1969) 276 Cal.App.2d 770, 771-772.) The question of where to draw the dividing line between " 'connected' " and " 'independent' " statements must be answered considering the statutory purpose—to promote candor in settlement negotiations. (*Caira,* at p. 36.)

### 2.

In the Caldwell letter, dated January 26, 2018, Caldwell summarized Whiting-Turner's understanding from the prior day's settlement discussion. Specifically, Caldwell asked 250 Fourth for a "change order in the amount of $6 million AND SECURED PAYMENT for all previous Claims and change orders to 'clean up' the project matters thru December 30, 2017." Whiting-Turner also requested coordinated planning efforts so that both parties could "come to [a] specific conclusion on how to move forward with the balance of the work from January 1, 2018 thru the opening of the hotel." Whiting-Turner concluded the letter by extending its termination date to January 30 but noting that its work suspension would continue until construction planning negotiations were finalized.

The referee granted Whiting-Turner's motion to exclude the Caldwell letter under Evidence Code section 1152. The referee explained that the letter was inadmissible because it was an offer to compromise that 250 Fourth sought to admit to show Whiting-Turner's liability.

### 3.

250 Fourth argues that Whiting-Turner was judicially estopped from objecting to admission of the Caldwell letter. 250 Fourth also contests the referee's decision that the Caldwell letter meets the statutory requirements of Evidence Code section 1152, arguing that the letter constituted a "non-negotiable demand" for payment—not an offer to compromise—and that it

16

was not offered to prove liability. 250 Fourth is wrong on all points.

First, 250 Fourth did not invoke judicial estoppel below as a basis for admission of the Caldwell letter. Accordingly, that argument was forfeited. (See *People v. Accredited Surety & Casualty Co.* (2022) 77 Cal.App.5th 185, 188; *Cabatit v. Sunnova Energy Corp.* (2020) 60 Cal.App.5th 317, 322.)

In any event, 250 Fourth does not identify any position *Whiting-Turner successfully asserted*—i.e., one adopted or accepted by the referee—that was totally inconsistent with its later position regarding admissibility. (See *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 422.) 250 Fourth primarily contends Whiting-Turner should have been estopped from objecting to admission of the Caldwell letter because *250 Fourth* had previously relied on it—to support its opposition to a motion in limine filed by Whiting-Turner (which the referee granted)—without Whiting-Turner raising any objection. But "silence and lack of objection does not result in judicial estoppel." (*Brown v. Ralphs Grocery Co.* (2018) 28 Cal.App.5th 824, 842.) Nor does the protection provided by Evidence Code section 1152 constitute a privilege that can be waived through disclosure. (See Evid. Code, § 912, subd. (a); *Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1495.)

Second, the Caldwell letter is not admissible because it was (in essence) a demand letter and not an offer to pay or credit 250 Fourth. (See Evid. Code, §§ 1152, subd. (a) ["[e]vidence that a person has . . . promised to furnish money or any other thing, act, or service to another who has sustained or will sustain . . . loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible"], 1154.) Evidence Code section 1154 provides: "Evidence that a person has accepted or *offered or promised to accept a sum of money* or any other thing,

17

act, or service *in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof*, is inadmissible to prove the invalidity of the claim or any part of it." (Italics added.) The analysis of admissibility "does not differ under these two related statutes," so any error in analyzing the issues under Evidence Code section 1152 instead of Evidence Code section 1154 is not dispositive. (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1475, fn. 2.)

Here, the Caldwell letter was intended to prompt 250 Fourth to either accept Whiting-Turner's demand or make a counteroffer to settle the parties' mutual disputes—regarding Whiting-Turner's suspension of performance and 250 Fourth's failure to pay progress payment applications and change orders. (See *Zhou v. Unisource Worldwide, supra,* 157 Cal.App.4th at p. 1477.) In fact, 250 Fourth's counsel (Jay Houghton) responded to the Caldwell letter that same day by confirming its receipt and stating, "250 Fourth will respond to Whiting-Turner's latest offer no later than January 30, 2018." 250 Fourth's belated attempt to recharacterize the letter is not persuasive.

Finally, 250 Fourth contends, in passing, that the Caldwell letter was admissible because 250 Fourth did not offer it to prove Whiting-Turner's liability but merely "as evidence of 250 Fourth's mental state." 250 Fourth forfeits this argument by failing to demonstrate—through the citation of authority and the assertion of nonconclusory legal argument—the materiality of its (or Singh's) mental state. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Hernandez, supra,* 37 Cal.App.5th at p. 277 ["[w]e may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt' "]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 ["[t]o demonstrate error, appellant must present meaningful legal analysis supported by citations to authority"].)

18

In any event, 250 Fourth ultimately concedes that it sought to admit the Caldwell letter to support its claim that, by the time it was sent, Whiting-Turner had abandoned the contract by continuing its (purportedly improper) suspension of work. 250 Fourth's position on abandonment was one of the claims at issue in the parties' settlement negotiations.

Accordingly, the referee did not abuse its discretion in excluding the Caldwell letter. (See *Fieldson Associates, Inc. v. Whitecliff Laboratories, Inc., supra,* 276 Cal.App.2d at p. 772 ["[s]ection 1154 makes an offer of compromise inadmissible to show invalidity of the claim to which the offer related"], italics omitted.)

## D.

In a series of related arguments, 250 Fourth vaguely asserts that the judgment against it is the result of the referee's erroneous interpretation of the contract provisions governing termination by the contractor (§§ 14.1.2, 14.3) and termination by the owner (§ 14.2.1). Specifically, 250 Fourth contends that, *in concluding that Whiting-Turner was justified in terminating the contract*, the referee misconstrued the contract language in several respects: (a) by reading out "*entire* work" from section 14.1.2 and (b) by ignoring the contractual requirement that qualifying suspensions and delays be ordered, in writing, by the owner (§§ 14.1.2, 14.3). 250 Fourth also argues that the referee misinterpreted the contract in finding that its architect was not the "initial decision maker." Again, 250 Fourth does not meet its burden to demonstrate prejudicial error.

## 1.

Section 14.1.2 of the General Conditions provides: "The Contractor may terminate the Contract if, through no act or fault of the Contractor or a Subcontractor, Sub-subcontractor or their agents or employees or any other persons or entities performing

19

portions of the Work under direct or indirect contract with the Contractor, repeated suspensions, delays or interruptions of the *entire* Work by the Owner *as described in Section 14.3* constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less." (Italics added.) Section 14.3.1 provides: "The Owner may, without cause, *order* the Contractor *in writing* to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine." (Italics added.)

In rejecting 250 Fourth's claim that Whiting-Turner was responsible for the first material breach, the referee stated: "[250 Fourth's] delays, coupled with the lack of compliance with payment obligations . . . , supported Whiting-Turner's decision to provide a 7-day notice of termination on January 10, 2018.

"First, based upon the evidence presented, the Court believes that 250 Fourth is interpreting Section 14.1.2 as requiring that the entire Project be suspended, delayed or interrupted, rather than the entire 'Work.' 'Work' is defined in the Contract as '[t]he construction and services required by the Contract Documents, whether completed or partially completed' and 'may constitute the whole or a part of the Project.' Since Work includes the whole or a part of the Project, it is difficult to discern what is meant by suspending, delaying or interrupting the 'entire' Work, which would be comprised of many different tasks. The Court finds that a reasonable interpretation of this ambiguity is that it is not referencing the entire 'Project,' which is defined as 'the total construction of the work performed under the Contract Documents that may be the whole or a part and which may include construction by the Owner and by separate contractor.' It is referencing the Work required by the Contract in order to achieve timely completion of the Project. In other words, repeated delays or interruptions that break the continuity or progress of the Work.

20

"Second, Section 14.1.2 references suspension, delay or interruption of the Work by the Owner for 120 days in any 365-day period. 250 Fourth's assertion that Whiting-Turner's notice of termination was improper appears to focus on the suspension aspect of Section 14.1.2, not the delay or interruption options. The Court finds that the evidence presented establishes that delays on the critical path resulting from Virgin's multiple ongoing design changes and modifications resulted in sufficient delays and interruptions to the progress towards completion of the entire Work. [¶] These delays and interruptions occurred through no act or fault of Whiting Turner or any of its subcontractors . . . and resulted in Whiting-Turner's inability to coordinate and sequence ongoing and upcoming work. These delays caused by Virgin and 250 Fourth (not Whiting-Turner) establish sufficient compliance by Whiting-Turner with the requirements of Sections 14.1.2." (Bold and fn. omitted.)

The referee found Whiting-Turner's notice of termination, dated January 10, 2018, met the contractual requirements, and did not constitute abandonment of the project or material breach of the contract. The referee continued: "The evidence presented supports a finding that Whiting-Turner *never carried out* the termination, which had been postponed twice during the parties' settlement negotiations and was still on hold awaiting 250 Fourth's response to Whiting-Turner's January 26, 2018 settlement offer. . . . [T]he parties' belated characterization of the termination notice . . . does not overcome the evidence that the termination had been postponed during settlement negotiations, which were then interrupted by 250 Fourth's own purported termination for cause. [¶] As such, . . . the [January 10 letter] cannot be construed as a material breach or an abandonment." (Italics added.)

Section 14.2.1 of the General Conditions entitled 250 Fourth to terminate "for cause" if Whiting-Turner "repeatedly

21

refuses or fails to supply enough properly skilled workers or proper materials" or "otherwise is guilty of substantial breach of a provision of the Contract Documents."  To terminate on that basis, "[250 Fourth], *upon certification by the Initial Decision Maker that sufficient cause exists to justify such action*, may without prejudice to any other rights or remedies . . . *and after giving* [Whiting-Turner] . . . *seven days' written notice*, terminate employment of [Whiting-Turner]."  (Italics added.)

In concluding that 250 Fourth's termination constituted a material breach of the contract, the referee (among other things) construed section 14.2.2 as requiring 250 Fourth, as a condition precedent to termination, to obtain a valid certification from the "initial decision maker."

**2.**

We need not address the merits of 250 Fourth's contract interpretation arguments because, even if we assume that 250 Fourth is correct and the referee misconstrued the contract, it fails to demonstrate how this would be of any consequence given the referee's unchallenged factual findings.

250 Fourth contends that, if the contract is properly construed, "this Court should conclude that Whiting-Turner *did not properly terminate* the [c]ontract and that the [j]udgment must be reversed."  (Italics added.)  250 Fourth appears to be challenging a finding that the referee did *not* make—that Whiting-Turner justifiably terminated the contract—by arguing that such termination was not contractually justified.

There is no such finding.  In fact, the referee explicitly found that Whiting-Turner did *not* suspend its work on the project before January 18, 2018 and "*never* carried out the termination, which had been postponed twice during the parties' settlement negotiations and was still on hold" at the time of 250 Fourth's termination.  (Italics added.)  The referee continued,

22

"[a]s such, . . . the January 10 [letter] cannot be construed as a material breach or an abandonment."

250 Fourth forfeited substantial evidence challenges to those findings by failing to explicitly raise them in its briefs. (See *Superior Motels, Inc. v. Rinn Motor Hotels, Inc*. (1987) 195 Cal.App.3d 1032, 1051-1052 [materiality question is one of fact]; *Tremble v. Tuman* (1919) 41 Cal.App. 8, 10-13 [question of abandonment is one of fact and jury's finding will be upheld if supported by substantial evidence regardless of interpretation of contractual provisions]; *Fonda v. First Pioneer Farm Credit, ACA* (N.Y. 2011) 86 A.D.3d 693, 695 [whether anticipatory repudiation occurred " 'is a factual determination [and] heavily dependent upon a determination of whether "a breaching party's words or deeds are unequivocal" ' " indication of intent not to perform].)

250 Fourth's opening brief cites one section of the Civil Code governing the interpretation of contracts and one unpublished recommendation from a magistrate judge to a federal district court—to purportedly support its interpretation of "entire work" and the written suspension order requirement (*Sunrise of Coral Gables Propco, LLC v. Current Builders, Inc*. (S.Dist. Fla. Oct. 17, 2023) 2023 U.S. Dist.LEXIS 187514). However, 250 Fourth offers *no* authority to support its position that, despite never having terminated, "if Whiting-Turner lacked a [contractual] right to terminate the Contract," Whiting-Turner's January 10 letter "was a material breach that would have reduced or precluded its damages claims." We agree with Whiting-Turner that 250 Fourth has not met its burden to show prejudicial error. (See Cal. Rules of Court, rule 8.204(a)(1)(B); *Hernandez, supra*, 37 Cal.App.5th at p. 277; *In re S.C., supra*, 138 Cal.App.4th at p. 408.) It is not our role to construct arguments on appellants' behalf. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

23

With respect to 250 Fourth's own termination, we reach a similar conclusion regarding the initial decision maker certification issue. Because it fails to challenge the referee's alternative analysis—that 250 Fourth's termination materially breached the contract because none of the triggering circumstances arose (§ 14.2.1) and because 250 Fourth failed to give Whiting-Turner seven days' notice (§ 14.2.2)—250 Fourth cannot meet its burden to show prejudicial error.

## E.

250 Fourth insists that the referee erred in refusing to apportion cause for delays. 250 Fourth again fails to meet its burden to show error.

## 1.

The contract provides that, if Whiting-Turner "fails to achieve Substantial Completion of the Work within the Contract Time," 250 Fourth is entitled to recover liquidated damages "until the date that the Contractor achieves Substantial Completion of the entire Work." (§ 4.3.1.1) 250 Fourth was also authorized to "deduct liquidated damages . . . from any unpaid amounts then or thereafter due the Contractor under this Contract." (§ 4.3.1.2)

In its statement of decision, the referee awarded Whiting-Turner damages but denied 250 Fourth any offset for liquidated damages. Despite explicitly finding that Whiting-Turner contributed to delays on the project, the referee declined to apportion responsibility for critical path delays.

The referee's s rationale for doing so appears to have been in the alternative. First, the referee suggested that 250 Fourth failed to meet its burden to provide the requisite apportionment analysis. Second, the referee also indicated that apportionment of delay is not required in cases where the owner and contractor share fault for delay.

24

**2.**

In asserting error, 250 Fourth focuses solely on the latter basis for the referee's denial of an offset.

At least historically, there has been a split of authority regarding whether a construction contract's liquidated damages provision is enforceable against a contractor when at least part of the delay is caused by the owner. (See 1 Acret et al., Cal. Construction Contracts, Defects, and Litigation (Cont.Ed.Bar 2023) Drafting Construction Contracts, § 2.36, pp. 2-35-2-36; compare *Gogo v. L.A. etc. Flood Control Dist.* (1941) 45 Cal.App.2d 334, 344 (*Gogo*) and *Aetna Cas. etc. Co. v. Bd. of Trustees* (1963) 223 Cal.App.2d 337, 340-341 (*Aetna*) [refusing to enforce liquidated damages provision where parties were mutually at fault for delays] with *Jasper Construction, Inc. v. Foothill Junior College Dist.* (1979) 91 Cal.App.3d 1, 13-15 (*Jasper*), overruled on other grounds by *Los Angeles Unified School Dist. v. Great American Ins. Co.* (2010) 49 Cal.4th 739, 752-753; *Nomellini Constr. Co. v. State of California ex rel. Dept. of Wat. Resources* (1971) 19 Cal.App.3d 240, 245-246 (*Nomellini*) [at least where contract provides for extension of time for delays not attributable to contractor, trial court is obligated to apportion delays based on fault to enforce liquidated damages provision].)

The rule applied by the *Gogo* and *Aetna* courts has been attributed to the fact that, before 1977, courts and the Legislature viewed liquidated damages provisions with general disfavor. (See 1 Acret et al., Cal. Construction Contracts, Defects, and Litigation, *supra*, § 2.36, pp. 2-35-2-36; *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 654; see *Aetna, supra*, 223 Cal.App.2d at p. 340 ["[l]iquidated damages are a penalty not favored in equity"].) After a 1977 amendment to Civil Code section 1671, liquidated damage clauses in construction contracts are now presumed valid. (Civ. Code,

§ 1671, subd. (b); Stats. 1977, ch. 198, § 5 [eff. July 1, 1978];
*Weber, Lipshie & Co.,* at p. 654.)

Commentators and courts alike have since said that, when some delay is caused by the owner and some is caused by the contractor, the better-reasoned approach is to apportion delay so that liquidated damages provisions are enforced. (See 1 Acret et al., Cal. Construction Contracts, Defects, and Litigation, *supra*, § 2.36, pp. 2-35-2-36; *Jasper, supra*, 91 Cal.App.3d at p. 14 [public contract]; *Nomellini, supra*, 19 Cal.App.3d at p. 246 [public contract].) These courts have rejected the notion that apportionment is unduly burdensome. (*Jasper,* at p. 15; *Nomellini,* at p. 246 ["[q]uantum of delay in terms of time is all that is being apportioned" and "[t]hat is an uncomplicated fact finding process"].)

Here, the parties do not dispute that the contract contains provisions that explicitly allow—in fact require—apportionment of fault for delay. Under section 8.3.1 of the General Conditions, 250 Fourth reserved its right "to seek any and all legal and/or equitable remedies against [Whiting-Turner] based on any delay that is *not* attributable to an Excusable Delay." (Italics added.) Whiting-Turner also "acknowledge[d] and agree[d] that adjustments in the Contract Time [and Contract Sum] will be permitted for a delay *only to the extent such delay . . . is not caused, or could not have been anticipated, by [Whiting-Turner].*" (Italics added.)

Nonetheless, Whiting-Turner argues that 250 Fourth is precluded from enforcing the liquidated damages provision because 250 Fourth itself contributed to the delay—in reliance on the *Gogo* and *Aetna* line of cases. The referee apparently agreed. We are skeptical that this remains the correct rule and tend to agree with 250 Fourth that apportionment is the modern rule. (See *Vought Construction Inc. v. Stock* (2022) 84 Cal.App.5th 622, 636 [trial court correctly held that "[contractor] was not relieved

26

of the obligation to pay liquidated damages for the delay that it caused even though it was not responsible for the entire delay"]; *Jasper, supra,* 91 Cal.App.3d at p. 14 [noting that contracts at issue, in both *Gogo* and *Aetna*, "did not evince an intent that liquidated damages could be assessed even where delay was caused by both parties"]; *Nomellini, supra*, 19 Cal.App.3d at p. 245 ["[a]ssuming . . . that there were delays which [were not the fault of the contractor], they were delays which the trial court would have been obligated to apportion"].)  However, we need not resolve this question conclusively.

Even if we assume that 250 Fourth is correct and that the referee was required (in an appropriate case) to apportion delay (see *Jasper, supra*, 91 Cal.App.3d at p. 14; *Nomellini, supra*, 19 Cal.App.3d at p. 246), the referee did not err in declining to apply an offset in 250 Fourth's favor.  250 Fourth still bore the burden of *proving* actual apportionment of the delay (in other words, the expense attributable to each party).  (See *Nomellini,* at pp. 242-243 [evidence showed 2,440 of total 6,840 delay days not attributable to contractor]; cf. *Sauer Inc. v. Danzig* (Fed. Cir. 2000) 224 F.3d 1340, 1347.)  250 Fourth did not meet its burden, either here or below.

On appeal, 250 Fourth has not pointed us to any delays by Whiting-Turner that are separate and independent from its own delays.  While it is true that the referee found that Whiting-Turner's framing and drywall subcontractor (Andujo's Drywall, Inc.) caused some unspecified delay, 250 Fourth cites no place in the record where it proved (or even tried to prove) any specific amount of delay attributable solely to the subcontractor.  Nor has our independent review of 250 Fourth's closing trial brief, and its objections to the proposed statement of decision, revealed that it

27

met this burden below.[7]  Without such a showing, we fail to see how apportionment was possible.  (See *Essex Electro Engineers v. Danzig* (Fed. Cir. 2000) 224 F.3d 1283, 1292.)

Moreover, it would have to do so using the evidence from Whiting-Turner's scheduling expert.  The referee explicitly found that Whiting-Turner's scheduling expert (John Sims) was more persuasive than 250 Fourth's.  Sims testified that 250 Fourth— through its delay in providing complete and coordinated design documents for guest rooms and the public areas—caused 322 days of delay (in the October 2016 and May 2017 period) on the critical path.  The referee could reasonably rely on this evidence to infer that 250 Fourth's design delays were the independent reason that the May 2017 completion deadline was missed.  In fact, the referee explicitly found that "the evidence establishes fault and problems by both parties in moving towards completion of the Project."  But it found that Virgin's design delay resulted in "delays to the Work that were *totally independent* of delays caused by Whiting-Turner" (italics added), and that the delays caused by Whiting-Turner (or its subcontractors) were "concurrent" to excusable delays attributable to 250 Fourth.

On this record, 250 Fourth cannot meet its burden to show error merely by pointing out that Andujo's *also* was responsible

_____

[7] If the referee overlooked some key piece of evidence or expert analysis buried in the voluminous record (90 volumes), it was 250 Fourth's duty to point that out in its objections and in its opening brief on appeal.  250 Fourth has not met that burden by, in its opening brief, citing two pages of Sims's testimony that amount to a highly ambiguous reference to a "missing link" in the project schedule.  It is not our role to search the voluminous record for evidence, if any exists, to support 250 Fourth's implicit assertion that any delay attributable to this "missing link" was caused by Whiting-Turner and was not concurrent with delays caused by 250 Fourth/Virgin.  (See *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

for some delay in January and February of 2017. (See *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 466 [" 'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law' "].) 250 Fourth fails to meet its burden to show prejudicial error on appeal. (See Cal. Rules of Court, rule 8.204(a)(1)(C); *Hernandez, supra*, 37 Cal.App.5th at p. 277.)

## F.

250 Fourth contends that Whiting-Turner failed to properly quantify certain categories of its damages. But the record does not support 250 Fourth's assertion that the referee erred by awarding certain damages without requiring Whiting-Turner to establish the requisite elements of a "modified total cost claim."

## 1.

Whiting-Turner presented evidence of damages, primarily through the testimony of its project manager (Mangat), in five categories: (1) the amount 250 Fourth owed based on unpaid October-December 2017 payment applications; (2) unpaid retention; (3) unpaid (but undisputed and approved) change orders; (4) disputed change orders; and (5) additional costs for framing and drywall work made inefficient by the absence of complete design documents. In CN296A and CN296B, Whiting-Turner requested compensation for additional staffing costs it incurred due to 250 Fourth's incomplete design and the associated delays, which necessitated a schedule extension to December 31, 2017.

Generally, recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the specific damages claimed were caused by a particular breach. (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228,

29

244 (*Amelco*); accord, Civ. Code, § 3300.) An exception to this rule is found in the acceptance of the total cost method. (See 1 Acret et al., Cal. Construction Contracts, Defects, and Litigation, *supra,* § 5.108, p. 5-78.) That method may be used "in situations in which a contractor's operations are made inefficient and performance is delayed by numerous changes or acts of interference, making it impossible for a contractor to introduce specific evidence of damage attributable to a particular breach." (*Ibid*.)

Under the disfavored total cost method, which is used only as a last resort, damages are calculated by subtracting the contract bid amount from the contractor's total cost of performance. (*Amelco, supra,* 27 Cal.4th at pp. 243-244; accord, *JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc*. (2015) 243 Cal.App.4th 571, 589 [" 'total cost method derives damages as the difference between a contractor's actual costs and its original bid' "].) In *Amelco,* our high court established that a plaintiff seeking disfavored total cost damages must demonstrate "(1) the impracticality of proving actual losses directly; (2) the plaintiff's bid was reasonable; (3) its actual costs were reasonable; and (4) it was not responsible for the added costs." (*Amelco,* at pp. 242-243.) The same prima facie evidence is required to recover on a modified total cost claim— wherein some of the contractor's costs are subtracted as unreasonable or because they resulted from the contractor's own errors or omissions. (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1408 (*Dillingham-Ray*); *Servidone Constr. Corp. v. United States* (Fed.Cir. 1991) 931 F.2d 860, 862.)

## 2.

We do not agree with 250 Fourth that the referee awarded total cost damages without requiring Whiting-Turner to satisfy the *Amelco* requirements. Instead, Whiting-Turner is correct

that the total cost claim cases are distinguishable (and do not apply here) because they involve completed projects—not projects where a contractor has been prevented from completing the work because it has been wrongfully terminated. (See *Amelco, supra*, 27 Cal.4th at pp. 233, 240 [project completed]; *Dillingham-Ray Wilson v. City of Los Angeles, supra*, 182 Cal.App.4th at p. 1400, [same]; *JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc., supra*, 243 Cal.App.4th at p. 576 [same].)

Here, the referee found that "250 Fourth materially breached the Contract *by wrongfully terminating Whiting-Turner, entitling Whiting-Turner to damages.*" (Italics added.) When an owner cannot prove that its termination of a contractor's performance was justified, it may be liable to the contractor for wrongful termination damages—measured by "the amount of his loss, which may consist of his reasonable outlay of expenditures toward performance as well as the profits which he would have made by performance." (*Gollaher v. Midwood Constr. Co.* (1961) 194 Cal.App.2d 640, 649; accord, *McConnell v. Corona City Water Co.* (1906) 149 Cal. 60, 65-66.)

The record makes plain that this is all that the referee awarded Whiting-Turner with respect to CN296A, CN296B, and the drywall inefficiency claim. In these three areas, the referee merely subtracted "the amount that the owner actually paid Whiting-Turner," along with other costs 250 Fourth was not responsible for, from Whiting-Turner's costs incurred towards performance. The contractor then added the contractually agreed fee. These damages were attributable to 250 Fourth's breach (the wrongful termination). 250 Fourth does not persuasively demonstrate otherwise.

### DISPOSITION

The judgment is affirmed. Whiting-Turner is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

BURNS, J.

WE CONCUR:

SIMONS, ACTING P.J.
CHOU, J.

*The Whiting-Turner Contracting Company v. 250 Fourth Development LP et al.*
*(A168492)*