Filed 5/14/26  Zheng v. Zheng CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WEN YU ZHENG,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GENE ZHENG,<br><br>    Defendant and Appellant. | G064312<br><br>(Super. Ct. No. 30-2017-00941390)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Walter P. Schwarm, Judge. Affirmed.

Law Office of Evan Lee and Evan I. Lee for Defendant and Appellant.

The Maloney Firm, Patrick M. Maloney and Gregory M. Smith; Gregory Smith Law and Gregory M. Smith for Plaintiff and Respondent.

\*          \*          \*

This suit by Wen Yu Zheng against his son, Gene Zheng, arises from two property transactions that vested legal title in Gene.[1] The trial court found that the actual agreements were that Wen would continue to hold the beneficial interest in the properties, such that Gene became the trustee of a resulting trust. The precursor to this lawsuit was that Gene eventually claimed that he was the full owner of the properties and refused to recognize his father's interests. After a bench trial, the trial court not only agreed with Wen that he held a beneficial interest in the properties, but concluded Gene acted with oppression in denying his interests, resulting in a punitive damages award against Gene.

Gene appealed and essentially raises three issues.

First, because his wife was also on legal title to the properties, Gene contends she was an indispensable party to these proceedings. Ruling on a pretrial motion, the court disagreed, concluding that Gene could adequately represent her interests in the lawsuit. We agree with the trial court that Gene's wife was not so indispensable as to render the underlying judgment unenforceable. Although there may be some procedural challenges in enforcing the judgment, there was no reversible error in proceeding in her absence.

Second, Gene contends the court erred by admitting certain letters that were written in the context of settling a financial dispute between Gene and his brother Jack, arguing they constitute inadmissible settlement communications. We conclude that the court did not abuse its discretion in finding that the letters pertained to a wholly separate dispute, and thus they were admissible in this case.

---

[1] Because the parties share a last name, we refer to them by their first names. We intend no disrespect.

Finally, Gene contends it was against public policy to award a resulting trust in this case because the property transactions at issue were designed to defraud the United States government by concealing Wen's income and assets in order to make him appear eligible for Supplemental Security Income (SSI). The trial court rejected this argument for various reasons, including that Gene raised the issue for the first time in his post-trial motion to vacate the judgment. We hold that this delay in raising the issue prejudicially deprived Wen of the opportunity to present evidence in his own defense, and thus Gene has forfeited the issue. Accordingly, we affirm the judgment.

FACTS

I.

THE TRIAL COURT'S FINDINGS

In 1981, Wen and his wife moved from China to Huntington Beach. In 1983, Wen and his wife purchased a house on Terry Drive in Huntington Beach (the Terry Property). In 1984, Gene, who is Wen's son, moved from China to the United States and began residing in the Terry Property.

In 1999, Gene advised his parents that they were considered low income and thus were eligible to apply for SSI. However, he advised them that if they transferred away the Terry Property, "that would be even better." Gene suggested transferring the Terry Property to him so that he could help manage the property.

Instead, Wen transferred the Terry Property to his daughter Ge Dong via grant deed because she did not own any property. Ge Dong did not pay any money for the transfer of the Terry Property, and after the transfer, Wen and his wife continued to live in the Terry Property as they always had.

3

Ge Dong understood that the property had been transferred to her so that her parents could apply for SSI benefits. She testified that this scheme was Gene's idea. Ge Dong lived in the Terry Property but paid rent to her parents because, according to her, the property belonged to her father, not her. Her father continued paying the utilities and reimbursed Ge Dong for property tax and insurance payments.

That same year, 1999, Gene advised Wen to transfer the money in Wen's bank accounts to him so that Gene could manage the money. Wen transferred approximately $150,000 to Gene.

In 2010, Gene approached Wen with a proposal to use some of the money Wen had transferred to invest in a property in Santa Ana (the Goldenwest Property). Gene and Wen purchased the property together, with Wen contributing $150,000, and Gene financing the remainder. The two had a verbal agreement to split the rental income from the Goldenwest Property evenly. In order to avoid impacting Wen's eligibility for SSI, the Goldenwest Property was held in Gene's name.

The following year, Gene suggested that Wen transfer the Terry Property from Ge Dong to Gene. His rationale was that Ge Dong had been sick, and if the property ever passed to Ge Dong's husband, the husband might not "honor the agreement." Wen agreed to do so under a verbal agreement that Gene and Gene's wife hold the property in their name for the benefit of Wen.

The actual method the parties used to transfer the property was somewhat convoluted. Gene, Ge Dong, and Jack, the younger brother, engaged in a sham transaction in an attempt to keep the tax basis of the property lower (which, in the end, did not work; Orange County assessed a higher value for tax purposes). They did this by having Jack loan the

4

purchase money to Gene; Gene paid Ge Dong for the property; Ge Dong then paid all the money back to Jack so that it returned to him full circle. Ge Dong openly testified that this was a sham transaction and that the property, in fact, belonged to Wen at all times.

Wen's wife passed away in 2016. Afterward, he asked Gene to distribute some of the property. However, Gene refused, claiming that the Terry Property, the Goldenwest Property, and the funds in the bank accounts were all in his name and belonged to him.

## II.

### GENE'S VERSION OF EVENTS

While the foregoing summarizes the court's ultimate factual findings, Gene offered a different version of events at trial.

Gene denied telling Wen that he would be eligible for SSI if he transferred property out of his name. He testified that the only assistance he gave Wen was driving Wen to the Social Security office.

With regard to the transfer of the Terry Property to his name in 2011, Gene denied that he paid for the property with a loan from his brother Jack. Rather, he testified that he received $350,000 from "the family business" which would be deducted from his share in the future when the assets were being split between himself and his siblings. He testified that Jack managed the business, but that all of the siblings had ownership in it. He denied that he held the Terry Property for Wen's benefit. The court found this was all false. The court found this was a sham transaction and that Gene did not pay any consideration for the Terry Property. It further found that no such family business existed.

5

With regard to the Goldenwest Property, Gene testified that the $150,000 did not come from accounts belonging to Wen, but instead came from a "family emergency fund" and that Wen had invested no more than $5,000. The court found this was false and credited Wen's testimony that the property was purchased jointly.

## III.

### THE JUDGMENT

The court issued a detailed statement of decision in which it generally made factual findings in favor of Wen and against Gene. It awarded Wen $208,500 in damages resulting from a breach of fiduciary duty and fraud. It also issued declaratory relief stating that Wen owned 100 percent of the Terry Property and 50 percent of the Goldenwest Property.

Further, it found that Gene's breach of fiduciary duty constituted oppression under Civil Code section 3294 for purposes of punitive damages. Subsequently, the court held an evidentiary hearing and awarded $400,000 in punitive damages against Gene. In reaching that amount, the court "place[d] significant weight on [Gene] abusing his position of trust as a trustee over the Terry and Goldenwest properties by asserting that [Wen] did not have an ownership interest in those properties, [by doing so], [Gene] jeopardized [Wen's] security in having a home for his advanced years." After the court entered judgment, Gene filed a motion for new trial and a motion to vacate the judgment. Following the court's denial of those motions, Gene timely appealed.[2]

_____

[2] Subsequently, we issued a writ of supersedeas staying execution of the judgment pending appeal.

## DISCUSSION

### I.

### GENE'S WIFE WAS NOT INDISPENSABLE

Gene's first and most robust argument is that his wife was an indispensable party to the trial and that we must reverse the judgment in her absence. His argument is based principally on the fact that both the Terry and Goldenwest Properties were conveyed by grant deed to Gene *and* his wife, Yan Ping, as community property. Prior to trial, Gene filed a motion to bifurcate the trial to first adjudicate his affirmative defenses, including his affirmative defense that his wife Yan Ping was an indispensable party. The trial court denied the motion, concluding Yan Ping was not indispensable because there is no requirement that a plaintiff sue both husband and wife in order to reach community assets, and Gene could adequately represent Yan Ping's interests. Gene contends this was error.

Code of Civil Procedure section 389 governs the joinder of indispensable parties. That section provides, "(a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party.

"(b) If a person as described in paragraph (1) or (2) of subdivision (a) cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder."

Because the ultimate decision of whether to proceed requires the balancing of practical and equitable factors, we review the court's decision to proceed in Yan Ping's absence for abuse of discretion. (*County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1151.)

We find no abuse of discretion. In general, a person may be sued without joining the person's spouse, and the judgment can be satisfied by community assets. Code of Civil Procedure section 370 provides, "A married person may be sued without his or her spouse being joined as a party, and may sue without his or her spouse being joined as a party in all actions." Further, Family Code section 910, subdivision (a), provides, "Except as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt *or to a judgment for the debt*." (Italics added.) (See *Reynolds and Reynolds Co. v. Universal Forms,*

8

*Labels & Systems, Inc.* (C.D. Cal. 1997) 965 F. Supp. 1392, 1396 ["Current statutory law makes clear that it is not necessary in California to name both spouses in the action in order to bind the community estate."].)

Here, the court concluded that Gene's and Yan Ping's interests were aligned, and thus Gene adequately represented Yan Ping's interests in the lawsuit. We find no reason to disturb that finding. Gene's principal goal in this lawsuit was to establish that he was the beneficial owner of the Terry and Goldenwest properties, which is the same goal Yan Ping would have had.

Gene disagrees, arguing, "Yan Ping's exclusion as an indispensable party under Code of Civil Procedure section 389 not only deprived her of the opportunity to protect her ownership interests but also foreclosed her ability to assert any applicable defenses, such as the statute of limitations, statute of frauds, presumption of complete title in each transfer, possible fraud and breach of fiduciary duty by Respondent and Appellant in addition to Family Code provisions concerning the control and transfer of community property." Other than the Family Code provisions, we fail to see why, as a practical matter, those defenses would not be asserted with equal vigor and competence by Gene himself.

With regard to the Family Law provisions, Gene contends that if he entered into secret oral agreements with Wen to take bare legal title, that would be a breach of various spousal duties to Yan Ping, and thus their interests are not aligned, which precluded him from representing her interests. This argument suffers from at least two flaws. First, Gene vigorously denied entering into any such agreements, and thus, as a practical matter, his litigation incentives were aligned with Yan Ping's. Second, to the extent Gene breached a marital duty to Yan Ping, such breaches can be litigated in any future family law proceeding between the two. Those

9

breaches would have been irrelevant in the present proceeding, and Gene has not offered any explanation for how they would have impacted Yan Ping's litigation strategy against Wen.

As Gene observes, there may be certain practical difficulties in enforcing the judgment in the absence of exercising jurisdiction over Yan Ping. For example, in proceedings below to obtain a stay pending appeal, the trial court observed that it had no jurisdiction to order Yan Ping to execute a deed in favor of Wen. Gene concludes that this shows the court could not afford "complete relief . . . among those already parties" as that phrase is used in Code of Civil Procedure section 389, subdivision (a). However, such difficulties do not necessarily render a party indispensable. As the court observed in *Countrywide Home Loans, Inc. v. Superior Court* (1999) 69 Cal.App.4th 785, 793-794, "The 'complete relief' clause 'requires joinder when nonjoinder precludes the court from effecting relief not in some overall sense, but between *extant parties*. In other words, joinder is required only when the absentee's nonjoinder precludes the court from rendering complete justice *among those already joined* . . . . Properly interpreted, [the "complete relief" clause] is not invoked simply because some absentee may cause future litigation. . . . . The fact that the absentee might later frustrate the outcome of the litigation does not by itself make the absentee necessary for complete relief.'"

Ultimately, because there is no generalized duty to join both spouses in an action to reach community property, our focus is on the practical implications of not joining Yan Ping. As a practical matter, we see nothing that would allow us to conclude that the trial court abused its discretion in concluding that Yan Ping's interests were adequately represented by Gene. The evidence from trial showed that the entire scheme

10

of property transfers was concocted by Gene and Wen, with no real involvement from Yan Ping other than her passively receiving legal title to the properties as community property. The court could reasonably conclude that her interests were adequately protected because Gene had the incentive to make any relevant argument that she would have made. Moreover, while there may be some practical hurdles to enforcing the judgment because she was actually listed on title, they are solvable problems, even if they may require further litigation. As such, she was not an indispensable party, and the court did not err in proceeding in her absence.

## II.

### A RESULTING TRUST CAN BE IMPOSED ON YAN PING

Riffing on a similar theme, Gene contends that the court erred in imposing a resulting trust, because a resulting trust requires a voluntary agreement to act as trustee, yet there was no evidence that Yan Ping gave such consent. We conclude Gene's agreement was sufficient to bind Yan Ping.

"'A resulting trust arises by operation of law from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest. Such a resulting trust carries out and enforces the inferred intent of the parties. "Ordinarily a resulting trust arises in favor of the payor of the purchase price of the property where the purchase price, or a part thereof, is paid by one person and the title is taken in the name of another. 'The trust arises because it is the natural presumption in such a case that it was their intention that the ostensible purchaser should acquire and hold the property for the one with whose means it was acquired.'"' In other words, the relationship between resulting trustee and beneficiary arises where one, in good faith, acquires title to property *belonging to another*. The law implies an obligation on the part of the one in whom title has vested to

11

hold the property for the owner's benefit and eventually convey it to the owner. The trustee has no duties to perform, no trust to administer, and no purpose to pursue except the single purpose of holding or conveying the property according to the beneficiary's demands." (*Estate of Yool* (2007) 151 Cal.App.4th 867, 874.)

Gene has not cited any authority suggesting that a resulting trust requires that every trustee have given express consent to the transaction at issue. To the contrary, the caselaw above describes resulting trusts in terms of "inferred intent" and a "presumption." While it is certainly true that a resulting trust generally carries out the intention of the parties, here, the parties to the relevant transaction were Gene and Wen. Their intention was to create a resulting trust. Although Yan Ping was placed on title, she could only receive the proceeds of the actual agreement between Gene and Wen. That consisted of transferring bare legal title, subject to a duty to convey the property back to Wen at his request. Moreover, Yan Ping, like Gene, did not pay any money or other consideration for obtaining title to Wen's property. Accordingly, she is subject to the resulting trust.

III.

EXHIBITS 35-38 WERE NOT INADMISSIBLE SETTLEMENT COMMUNICATIONS

Next, Gene contends that the court prejudicially erred by admitting Exhibits 35-38, which are various letters Gene wrote in which he discussed his and Wen's finances. The court relied on these letters because they contain admissions by Gene corroborating Wen's claim that he paid for half of the Goldenwest Property. The court recognized that these letters were settlement communications, but it overruled Gene's objection under Evidence Code section 1152 because the letters were written to settle a wholly separate dispute involving $3,000,000 Chinese Renminbi belonging to Gene that his

12

younger brother Jack had used for investments in China. The court reached this conclusion based on both Gene's testimony and the way he characterized the letters in his closing trial brief. In Gene's closing trial brief, he stated, "Trial Exhibits 35, 36, 37 and 38 are letters Gene sent to Wen after Jack, under Wen's direction, had taken Gene's $3M Renminbi (RMB) in China. All four letters were written for the *sole purpose* of Gene trying to resolve with Jack, through Wen, the dispute involving Gene's missing $3M RMB." (Italics added.) In his trial testimony, Gene was asked, "You were sending those letters to urge your father to help you resolve an entirely different set of claims that you had against your brother, right, sir?" Gene responded, "yes."

We review the court's ruling on the Evidence Code section 1152 objection for abuse of discretion. (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 31-32.)

Evidence Code section 1152, subdivision (a), provides, "Evidence that a person has . . . offered . . . to furnish money or any other thing . . . to another who . . . claims that he or she has sustained . . . damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."

Evidence Code section 1152 only excludes evidence of settlement communications to prove liability for the claim being settled. It renders such evidence inadmissible to prove liability "for *the* loss or damage." (Italics added.) *The* loss or damage is the loss or damage the other party claims to have suffered. However, it does not render settlement communications inadmissible for all purposes. "Evidence Code section 1152 only prohibits 'the introduction into evidence of an offer to compromise a claim for the purpose of proving liability for *that claim*.'" (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 297.) Or as the court phrased it in *Zhou v. Unisource Worldwide* (2007)

13

157 Cal.App.4th 1471, 1478, Evidence Code section 1152 does not bar evidence of settlement negotiations from "a different lawsuit between different parties involving a different primary right."

Here, based on Gene's testimony and his representation in his trial brief, the court could reasonably conclude that Exhibits 35 through 38 pertained to a specific monetary dispute between Gene and Jack that had nothing to do with the property dispute between Gene and Wen at issue in the present case. Although Gene attempts to distance himself from his own characterizations, calling them "mistaken" and "inadvertent," the court acted within its discretion in relying on them. Accordingly, there was no abuse of discretion in admitting Exhibits 35 through 38.

IV.

GENE FORFEITED THE UNCLEAN HANDS DEFENSE

Gene's final argument is that the court abused its discretion by rejecting his unclean hands defense. Gene's argument is that the court should not have provided equitable relief to Wen because the entire scheme of property transfers was for the purpose of concealing Wen's wealth so that he could qualify for SSI. Gene raised this argument for the first time in his post-trial motion to vacate the judgment.

The trial court rejected this argument on multiple grounds: that Gene had not presented this defense as an issue to be decided at trial; that he himself had participated in the scheme; that it had not been proven, and no findings had been made, that the scheme was actually illegal; and that because any fraudulent conduct had been directed toward the government, not Gene, it declined to apply the unclean hands defense to the circumstances of this case.

14

Because the unclean hands defense is an equitable doctrine that depends on the unique factual circumstances of a given case, we review the court's ruling for abuse of discretion. (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447 (*Dickson*).)

"The defense of unclean hands does not apply in every instance where the plaintiff has committed some misconduct in connection with the matter in controversy, but applies only where it would be inequitable to grant the plaintiff *any* relief. [Citation.] The court must consider both the degree of harm caused by the plaintiff's misconduct and the extent of the plaintiff's alleged damages. [Citation.] Whether the defense applies in particular circumstances depends on the analogous case law, the nature of the misconduct, and the relationship of the misconduct to the claimed injuries." (*Dickson, supra,* 83 Cal.App.4th at pp. 446-447.)

"The defense of unclean hands must be raised in the trial court to be available. Accordingly, it must be pleaded or called to the attention of the trial court in order that it may pass on the defense *and also to permit the person against whom it is sought to be applied the opportunity to present such evidence as might bear on that issue.*" (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO* (1964) 227 Cal.App.2d 675, 726 (Italics added).)

Here, although Gene technically raised the issue in the trial court, he waited to do so until post-trial motions were heard. This deprived the court of the opportunity to make factual findings, and it deprived Wen of the opportunity to present evidence in his defense. Indeed, the record is not particularly clear as to even basic information such as exactly what federal program or programs Wen had applied to, much less the more complex factual presentation needed to decide whether Wen's alleged illegal conduct

warranted denying him all equitable relief. Consequently, Gene has forfeited the issue.

## DISPOSITION

The judgment is affirmed. Wen shall recover his costs incurred on appeal.

SANCHEZ, J.

WE CONCUR:

MOORE, ACTING P. J.

DELANEY, J.